**STANDARD OIL COMPANY (KEN-
TUCKY), Appellant,**

v.

**HUMBLE OIL & REFINING COMPANY,
Appellee.**

**No. 21674.**

United States Court of Appeals
Fifth Circuit.

July 1, 1966.

Rehearing Denied Sept. 6, 1966.

Beverly W. Pattishall, W. Thomas Hofstetter, Chicago, Ill., Robert W. Thompson, Jr., Gulfport, Miss., William E. Suddath, Jr., Jackson, Miss., Francis R. Kirkham, James B. Atkin, Harlan M. Richter, San Francisco, Cal., Charles G. Middleton, Jr., Louisville, Ky., Francis R. Kirkham, Pillsbury, Madison & Sutro, San Francisco, Cal., Woodson, Pattishall & Garner, Chicago, Ill., Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., Watkins & Eager, Jackson, Miss., Mize, Thompson & Mize, Gulfport, Miss., of counsel, for appellant.

Leslie D. Taggart, Ronald O. Thomas, Nicholas J. Stathis, New York City, M. M. Roberts, Hattiesburg, Miss., Dillard W. Baker, Houston, Tex., George F. Woodliff, Jackson, Miss., Francis X. Clair, New York City, Watson, Leavenworth, Kelton & Taggart, New York City, Heidelberg, Woodliff & Franks, Jackson, Miss., of counsel, for appellee.

Before RIVES and THORNBERRY, Circuit Judges, and GARZA, District Judge.

RIVES, Circuit Judge:

The Humble Oil & Refining Company is a wholly-owned subsidiary of Standard Oil Company of New Jersey.[1] Humble sought a declaratory judgment against Standard Oil of Kentucky[2] allowing Humble to use its Esso trademark in the five-state area[3] historically inhabited by Kentucky. Kentucky counterclaimed seeking to prevent the use by Humble of the Esso trademark or tradename in its area.[4] Two basic issues are raised. First, would Humble be guilty of unfair competition if it used the Esso mark in Kentucky's area? Second, has Kentucky through previous contracts given up its right, if any, to prevent the use by Humble of the Esso mark and name?

The district court found that Kentucky had contracted away its rights and entered a judgment for Humble. We reverse.

I.

To understand the unique problems engendered by the Standard Oil name and reputation, it is necessary to understand the history of that name. What came to be known as the Standard Oil Trust[5] began its growth in 1870. By 1899 Standard Oil was the dominant name in the American oil industry. A holding company, Standard Oil of New Jersey, was formed, and through it the vast Standard Oil holdings were controlled after 1899.[6] Through extensive national advertising and high quality products, Standard Oil achieved a nationwide reputation for excellence.

The "system of marketing * * * adopted [by the Standard Oil Trust was one] by which the country was divided into districts and the trade in each district in oil was turned over to a designated [Standard Oil constituent] corporation within the combination, and all others were excluded * . * *." [7] In 1911 the Supreme Court held that the Trust violated the Sherman Antitrust Act and ordered it dissolved. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

Under the method of operation employed by the Trust before 1911, Standard Oil of Kentucky had the exclusive common-law right to use the Standard name and marks within its five-state area just as Standard Oil of New Jersey had the exclusive right to use the Standard name and marks in its area.[8] After

1. In this opinion Humble will be used to include its predecessor Standard Oil of New Jersey, a Delaware corporation, as well as Standard Oil of New Jersey, a New Jersey corporation which is its current parent.

2. Hereafter Kentucky.

3. The five states in which Kentucky has had the exclusive right to the Standard Oil name since the use of that name first began are Kentucky, Mississippi, Alabama, Georgia and Florida.

4. Gasoline stations are principally recognized by the ID or identification signs placed close to the roadside. The major complaint in this case is that Humble uses Esso ID signs as well as prominently displays the Esso name on and around its stations and station sites.

5. Hereafter referred to as the Trust. As used in this opinion, the term Trust refers to Standard Oil of New Jersey during the period when it or its predecessors controlled all the other Standard Oil Companies; i. e., before 1911.

6. Originally the Standard Oil holdings were controlled through Standard Oil of Ohio but, because of problems with the State of Ohio, control was passed to Standard Oil of New Jersey. For a brief history of the Trust, see Standard Oil v. United States, cited infra n. 7.

7. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1 at 77, 31 S.Ct. 502, at 522, 55 L.Ed. 619 (1911).

8. The area of Standard Oil of New Jersey separates the State of Kentucky from the remaining states belonging to Kentucky's trade area. New Jersey's trade area is comprised of Pennsylvania, West Virginia, Maryland, Delaware, Virginia, Arkansas, Tennessee, North and South Carolina, Louisiana, and today includes part of Texas. Standard Oil of New York

the dissolution of the Trust, each of the original subsidiaries retained its respective exclusive right.

In 1927 Standard Oil of New Jersey (a New Jersey corporation) transferred its marketing operations to a subsidiary Standard Oil of New Jersey (a Delaware corporation). The Delaware corporation later changed its name to Esso Standard Oil Company and was so known from 1948 until 1960. In that year Esso Standard Oil became part of Humble.

The Standard Oil name has immense value as a marketing aid and has been the subject of numerous suits over who has the right to use it in a given territory. Until this case was decided by the court below, all of the reported cases had a single common denominator: the right to use the Standard Oil name and reputation belonged exclusively to the local Standard Oil company that first inhabited the trade area.[9] Standard Oil Company (Sohio) v. Standard Oil Company (of Indiana), 252 F.2d 65 (10 Cir. 1958); Esso v. Standard Oil Co. (of Indiana), 98 F.2d 1 (8 Cir. 1938); Standard Oil Co. of Colorado v. Standard Oil Co. (of Indiana), 72 F.2d 524 (10 Cir. 1934), cert. den., 293 U.S. 620, 55 S.Ct. 216, 79 L.Ed. 708, Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 56 F.2d 973 (10 Cir. 1932); Standard Oil Co. of Maine v. Standard Oil Co. of New York, 45 F.2d 309 (1 Cir. 1930); Esso Standard Oil Co. v. Standard Oil of New England, 170 F.Supp. 71 (D.N.H.1958); Standard Oil Co. (of Indiana) v. Standard Oil of North Dakota, 123 F.Supp. 227 (D.N.D.1954); Esso Standard Oil Co. v. Bazerman, 99 F. Supp. 983 (E.D.N.Y.1951); Standard Oil of New York v. Standard Oil of Maine, 38 F.2d 677 (D.Maine1930), aff'd, supra, 45 F.2d 309; Standard Oil Co. (of Indiana) v. Michie, 34 F.2d 802 (E.D.Mo.1929).

Prior to the dissolution of the Trust in 1911 and after the creation of the several entirely separate companies, with each one operating under the same name in different geographic areas of the United States, some of the companies adopted various pseudonyms for Standard Oil. Thus we find Standard Oil referred to as the "SO Company," [10] "SO Co.," "SOHIO,"[11] "KYSO," [12] "SOCONY," [13] "CALSO," [14] and "ESSO." [15] The public generally has come to associate all of these names with the prestige of Standard Oil.

Until recently Humble made no attempt to independently enter the marketing area of Kentucky. This may be attributed to the long history of friendly relations between the two companies and Kentucky's unusual position in the oil industry. Unlike other major oil companies, including the numerous Standard Oil companies, Kentucky was not a vertically integrated company. By that we mean Kentucky did not produce and refine its own crude oil but restricted its operations to the marketing level. Prior

---

originally had the exclusive right to the Standard name in New York, Vermont, Massachusetts, Connecticut, Rhode Island, and Maine. However, since Standard Oil of New York (SOCONY) now uses the SOCONY Mobil or Mobil name and the flying red horse symbol, the Esso trademark of Standard of New Jersey has been used freely in the New England area as well as its original trade area.

9. Because the first Standard Oil company in a given trade area can exclude the others from using the Standard name in that area, the various companies have adopted different marketing names for national use. Esso uses its Humble or Enco name; Standard of Indiana uses its

oval and torch with the American or Amaco name; Standard of California uses its chevron mark with the Chevron name; Standard Oil of Ohio uses such names as Fleetwing.

10. SO standing for Standard Oil was used in varying degrees by all of the Standard Oil companies and had been used nationally by the Trust.

11. Used by Standard Oil of Ohio.

12. Used by Kentucky Standard Oil.

13. Used by Standard Oil Company of New York.

14. Used by California Standard Oil.

15. ESSO comes from S.O.

to the dissolution of the Trust, Kentucky received its products from Standard Oil of New Jersey. Following the dissolution Kentucky continued through successive supply contracts to receive the majority of its requirements through the Standard of New Jersey family of corporations.

In 1958 the United States brought an antitrust suit against Kentucky and Humble [16] in an effort to dissolve this relationship and compel competition. Kentucky then explored the possibility of merging with Humble. But this, in the opinion of Humble, was not possible under the antitrust laws. Therefore, in 1960 Kentucky turned its attention to the possibility of merging with Standard of California, thus insuring that its source of supply would not be cut off or become dependent on a competitor. In 1961 the Government approved the merger with California and a consent decree in the case against Kentucky and Humble was entered.[17] It was only natural that, with its access to the lucrative five-state market through Kentucky impaired, Humble should enter the market itself.

Nine days after the consent decree in the antitrust suit was entered, Humble opened its first Esso station in the five-state area. At the time this case went to trial, over 776 Esso stations were in operation and their proliferation has not ceased.

■ It is difficult to discern whether the district court held that absent the contractual relationship of the parties, Humble could have entered the five-state

area using the Esso name. If the district court so held it was plainly wrong. The court below made numerous findings of fact, some of which are conflicting, as well as detailed findings of law. The factual findings are so interwoven with the district court's contract theory, it is impossible to believe that they were meant to apply to the issue of unfair competition taken alone. If they were, we hold that the findings on such issues as public confusion between Esso and Standard Oil are clearly erroneous.

The record in this case reveals the high degree of confusion that prevailed in the five-state area. In advertising a new subdivision in Mississippi, it was proudly proclaimed that the subdivision was near "the new $175,000,000 Esso plant at Pascagoula." The only error in this full page ad was that the plant belonged to Kentucky, not Humble. The State Times newspaper in Jackson, Mississippi, printed an article on why Kentucky chose Mississippi over Louisiana for its new plant. Titling the article, which discussed a letter from Kentucky Standard's president, the newspaper gratuitously added this touch, "Letter Tells Why Esso Chose State." [18] The record recounts many more occasions where announcers or newsmen made similar mistakes, not realizing Esso did not mean Standard—that is, Standard of Kentucky. But these mistakes merely reflect the general confusion on this score.

Kentucky received both complaints and accolades intended for Humble's Esso stations. Job applicants called them seeking employment at Esso stations. Esso's merchandise was some-

16. See n. 1, supra.

17. See 1961 CCH Trade Cases ¶70,037 (W.D.Ky.1961) (Case No. 1425). Under the decree, Kentucky was to terminate its supply arrangement with Humble during a 5-year tapering off period. In addition, Kentucky agreed to purchase at least 40% of its needs from "independent" suppliers until 1976. In the oil industry the term independent refers to non-major or non-name brand oil companies.

18. In attempting to derogate the value of this news article and like evidence, Humble refers to them as "similar isolated errors" and castigates Kentucky by saying, "Appellant has failed to mention that, by the second or morning edition of that same paper, this obvious error had been corrected." The error was not so obvious that it was caught before the evening or first edition of the paper. Its evidentiary value lies in the fact that it happened at all, not that at some point either through outside intervention or otherwise it was corrected.

times misdelivered to Kentucky. Patrons attempted to register for Esso contests or asked for prizes offered by Esso at Kentucky's service stations.[19] Many of Kentucky's patrons used their credit cards at Esso stations believing they were affiliated with Kentucky. Esso kept a record of some of these persons and at an opportune time sent them Esso credit cards. Many persons, thinking Esso and Standard were the same, destroyed their old Kentucky credit cards believing the new Esso cards had replaced them.

Upon receiving two separate bills, one from Esso and one from Kentucky, many of Kentucky's customers attempted to pay both with a single check or complained about the dual billing. The list of Esso's bills for work or services provided to Humble, or letters, wires and checks intended for Humble, which were mistakenly sent to Kentucky included items from such companies and organizations as Westinghouse Corporation, Sinclair Refining Company, the Admiral Semmes Hotel, the Savannah Chamber of Commerce, and the Better Business Division of the Miami-Dade County Chamber of Commerce. Numerous patrons from all walks of life and all levels of our variegated society frequented Esso stations, believing that they were either owned by or in some way affiliated with Kentucky.[20] A survey conducted in the five-state area also showed confusion, although the method of conducting this survey is open to great criticism.

While we hold that the district court's findings of no confusion are clearly erroneous as factual findings, we doubt whether the district court actually made findings which were intended to operate independently of its contract theory. The district court went to great lengths to explain why the confusion engendered by Esso's entry into Kentucky's trade area resulted from causes that excused Humble from being held accountable. *As a factual matter* there was confusion, whether its origin was such as would justify the court in allowing Humble to benefit by that confusion *is the question of law* which we must decide in this opinion.

■ Moreover, in deciding whether there was confusion between Esso stations and Kentucky stations, the district court disparaged the similarity in sound between the pronunciation of Esso and SO and noted the dissimilarity in the appearance of their respective signs. The court said (229 F.Supp. at 626–627):

"While there is some phonetic similarity between the words ESSO and the trademark S.O., yet the sound when pronounced is not entirely the same. In pronouncing the word ESSO emphasis is on the 'ES' and it has a different sound from that when pronouncing or speaking the trademark S.O. or SO, and in looking at them, there is no similarity. The photographs show clearly that a motorist exercising a slight degree of observation can see the STANDARD OIL sign and realize that it is the Standard Oil sign. If he sees the ESSO sign and is really looking for a Standard Oil station, by reasonable observation, as he drives to the station, he readily

---

19. Again, the importance of this type of evidence lies in the fact that it happened and is not mitigated because it is characterized by Humble as mainly hearsay.

20. Humble characterizes these witnesses as careless and meaningless because often they did not recall such things as the trade dress or color scheme of their local Standard station, or because they did not recall the name of the gasoline Standard Oil sold, i. e., Crown or Esso. The truth is that these failures of observation and recollection merely serve to emphasize that it is the "ID" sign or name of the station that motivates the patron's choice. If he believes Esso means Standard and so drives into an Esso station, it seems of little consequence that he believes that he is getting a Standard Oil gasoline product, whether the gasoline dispensed is Esso, Crown or even Chevron. It is this characteristic common to many gasoline consumers that motivated Esso to institute the declaratory judgment suit in the first place, and that motivated Kentucky to resist so vigorously.

can see that it is a Humble station and should not be confused."

Other courts have been unable to hear a difference between pronouncing "Esso" and SO. Esso v. Standard Oil Co. (of Indiana), 98 F.2d 1 at 5 (8 Cir. 1938). This was emphasized to us by the fact that at oral argument this Court had to constantly interrupt counsel and ascertain which word he was pronouncing. What is more important is that as a matter of law the district court misconstrued the test of public confusion. The test is not whether an ordinary buyer can on normal inspection tell that "Esso" as shown on the signs looks different from "Standard" or "Standard Oil" when shown on the signs. Rather the test is whether some normally intelligent buyers think that "Esso" is another name for Standard Oil or think it is in fact a Standard Oil designation, and therefore, believe Esso stations are Standard Oil stations. Cf. National Association of Blue Shield Plans and Group Medical & Surgical Service v. United Bankers Life Ins. Co., 362 F.2d 374 (5 Cir. 1966) (No. 21920, decided June 16, 1966).

The Tenth Circuit clearly and correctly stated the test when it found that "Sohio" caused confusion with "Standard" as used by Standard Oil of Indiana. The court there said [Standard Oil Co. (Sohio) v. Standard Oil Company (of Indiana), 252 F.2d 65 (10 Cir. 1958) at 73–74]:

"While in some cases, particularly those involving labels, the question of confusing similarity may be determined by visual observation of the words, signs, or symbols involved, the test is not solely such a 'juxtapositional comparison.' The setting in which the designations are used must be considered. As said in Avrick, supra [Avrick v. Rockmont Envelope Co., 10 Cir., 1946], 155 F.2d 568, at pages 572–573:

" 'It is the total effect produced by the designation in the mind of the ordinary purchaser, exercising due care in the market place.'

"The parties to this case are engaged in identical enterprises, the production, transportation, manufacture and sale of petroleum products. They draw their customers from the same sources. They compete openly and vigorously for business, using similar sales and publicity methods to appeal to the habits of the ordinary consumer. In such activities they must not compete unfairly or infringe upon the rights of the other.

"Infringement is not to be determined on the basis of the words or symbols themselves to the exclusion of other considerations. It is not necessary for similarity to go only to the eye or the ear for there to be infringement. The use of a designation which causes confusion because it conveys the same idea, or stimulates the same mental reaction, or has the same meaning is enjoined on the same basis as where the similarity goes to the eye or the ear. Confusion of origin of goods may be caused alone by confusing similarity in the meaning of the designations employed. The whole background of the case must be considered.

"The real issue is whether the use of 'Sohio' in plaintiff's territory has the 'total effect' of creating 'in the mind of the ordinary purchaser, exercising due care in the market place' the idea that the products marketed under that sign are 'Standard Oil' products. If it does, then there is infringement and unfair competition, as the only 'Standard Oil' reputation known to the public in the area involved is the reputation of the plaintiff."

Esso, like Sohio, is a coined word without inherent meaning. Sohio derives meaning from its relation to SO Ohio or Standard Oil of Ohio, and Esso derives its meaning from SO or Standard Oil. In the petroleum world and to the public each means and has its real value in meaning the products purchased here are Standard Oil products.

In 1958 Standard Oil of New England defended a suit on the ground that Esso by using that name had abandoned the Standard Oil name. As Esso so clearly proved, the "mark 'Esso' itself in the minds of the public represents the abbreviation of the words 'Standard Oil' * * *." Esso Standard Oil Co. v. Standard Oil Co. of New England, 170 F.Supp. 71 (D.N.H.1958), at 73. Of course, in that case the shoe was on the other foot and Esso was the one seeking to exclude others from its territory. Considering the long history of Standard Oil litigation and today's interstate motor travel, we think long cumbersome records are no longer necessary to prove the public believes that all of the pseudonyms for Standard Oil belong to the same or related companies.

This case is a striking example of how the general public is confused. The record is replete with instances of confusion and any finding to the contrary would have to be held clearly erroneous.

Humble argues that Kentucky added to this confusion by for many years selling and advertising Esso products. The distributorship ended, Humble now stands ready to claim its accumulated good will. Why, it asks, is this any different than Joe's service station which sold Shell gasoline and now wishes to exclude Shell from its territory? This argument overlooks the facts that Standard Oil of Kentucky has always had the sole exclusive right to sell any product that bears the Standard name or cognitive symbol in the five-state area. Esso

products could not have been sold or distributed at any time in the five-state area by anyone except by permission of Kentucky.[21] Thus, if Esso products gained any additional good will by being distributed here by Standard stations, it gained the good will that belonged to Kentucky and which Kentucky alone always had a right to have. For the good will gained was not as to Esso but as to a Standard Oil product.

Since Standard Oil of New Jersey took the Esso mark first, it gained the exclusive right to the mark but not the exclusive right to its meaning. This is no different from the mark of Standard Oil of Indiana—the oval and torch with "Standard" on it. They alone may use the mark but they must share its Standard Oil idea or meaning with all the other Standard companies. The sale of Esso products by Kentucky may have generated the public recogniation of the symbol, but it did not generate its meaning. That meaning Esso always had, for, as the alter ego for the letters SO, it always has meant Standard Oil.

Humble has also done its share to see that the relationship between Esso and Standard was not hidden from the motorists of the five-state area. Travelers from Mississippi, Alabama, Georgia and Kentucky on their way through Tennessee, for example, were greeted with billboards declaring "Welcome to Tennessee where Esso means Standard Oil." And, Esso radio and television advertising inevitably spilled over from its areas into

21. During the period before the antitrust suit that ended their close relationship, Humble was more than happy to have Kentucky associate the Esso name with the Standard Oil aura of superiority. Esso products gained their wide acceptance in the five-state area because they were sold by Standard Oil of Kentucky. Humble or its predecessors spent large sums on advertising and urged Kentucky to do the same. The point of this advertising was to link Esso products with Standard Oil and with Standard Oil of Kentucky. This case represents the usual distributorship situation in reverse. Generally, a distributor benefits from having his name linked to the nationally-known brand name he is distributing. Here, Esso products benefited from the nationally-known brand name of its distributor, the only company that could rightfully use Standard Oil or its cognitive symbol in the five-state area. Since Humble participated in making sure the public in the five-state area knew Esso meant Standard, they cannot now stand by and claim to be blameless. Unlike other distributorships, the value of this association derived from the fact that Esso meant Standard Oil and was to be distributed by a Standard Oil company, i. e., Kentucky.

the five-state area telling listeners that Esso means Standard Oil.

Therefore, whatever value Esso as a name now has is derived not from the fact that motorists believe its products are produced by Esso, but because the motorists believe Esso products are produced by Standard Oil, or at the very least by one of the Standard Oil companies. In the five-state area only Kentucky has the right to business based on the good will of Standard Oil. See, for example, Esso v. Standard Oil Co. (of Indiana) (8 Cir. 1938), 98 F.2d 1, at 4, 7 (where it was held that Esso's use of the words "Not connected with Standard Oil Company (of Indiana)" in its advertising, and even the use of such phrases in pamphlets distributed by it, was not sufficient to avoid confusion because the public believes there is a connection between all the Standard Oil companies). Cf. National Association of Blue Shield Plans and Group Medical & Surgical Service v. United Bankers Life Ins. Co., 362 F.2d 374 (5 Cir. 1966) (No. 21920, decided June 16, 1966).

We, therefore, hold that the record in this case clearly and repeatedly shows the profound confusion caused by Humble's use of the Esso mark in the five-state area. We further hold that any factual findings to the contrary made by the district court were either clearly erroneous or resulted from a misunderstanding of the law which caused the district court to test for confusion by an improper standard. Unless Humble has some rights conferred by its contractual relationship to Kentucky, its use of the cognitive Standard Oil symbol "Esso" constitutes unfair competition and must be enjoined.

## II.

Three contracts between Kentucky and the Standard Oil of New Jersey family of corporations have a bearing on this litigation. The first contract was executed on March 24, 1934 between Kentucky and Penola, Inc., a member of the Standard Oil of New Jersey family of corporations. It designated Kentucky as the sole distributor in the five-state area of Esso marine lubricants and other petroleum products supplied by or under authority of Penola.

The second contract was executed on September 15, 1938 between Kentucky and Standard Oil of New Jersey. It granted Kentucky the privilege of using the trademark Essotane in the five-state area.

The last contract, and the one with which we must be chiefly concerned here, was executed on January 27, 1955,[22] between Kentucky and Esso Standard Oil, being titled a "TRADEMARK LICENSE AGREEMENT." The district court found that by this contract Kentucky gave up all of its rights to exclude Humble from using its Esso mark in the five-state area.

While the court below applied intelligent and proper legal standards to the construction of this contract, we cannot escape the conclusion that it erred in its interpretation of this somewhat ambiguous document. The contract negotiations were entered into at a time when Kentucky was about to start canning motor oil supplied in bulk to it by Esso in cans displaying the Esso mark. Esso was clearly and properly concerned that, if it did not obtain some form of written agreement, it might lose its rights in the Esso mark at least in the five-state area.

For example at some future date Kentucky might obtain oil from another source and place it in cans saying "S.O." or "Esso" but not using Esso's exact mark or color scheme. Instead of a script Esso in an oval, Kentucky might use its own bar and half circle with a block Esso mark. To preserve its rights in its Esso mark, both regionally and nationally, Esso, therefore, sought a written agreement. There is no testimony that anyone at the time the contract was executed conceived of Esso

22. This contract is set forth verbatim in the opinion of the district court at 229 F.Supp. 586, at pp. 590–600.

coming into Kentucky's territory and selling Esso gasoline in Esso stations independently of Kentucky.

The contract itself is not directed to Esso's right to independently sell under the Esso name, but speaks of setting "forth specifically the terms and conditions *governing KENTUCKY'S use of* these Esso Standard trade marks" as *"used* hereafter *by KENTUCKY in connection with products supplied by* or on behalf of *ESSO STANDARD."* (Emphasis added.) What the contract was intended to do, and did, was to declare Kentucky's rights to use the Esso mark and prevent Kentucky from appropriating that mark to its own use and benefit. Nowhere did it give Esso the right to enter the five-state market under the Esso name. What it did reserve for Esso is the right that if anyone uses the Esso name in the five-state area it must either be Esso or by permission of Esso.

In this litigation Kentucky does not ask the right to use the Esso mark in the five-state area. This right Kentucky effectively surrendered when it agreed by contract that Esso had the "exclusive right to the use of these Esso Standard trade marks in the States of Alabama, Florida, Georgia, Kentucky and Mississippi." What Kentucky asks is that no other person, including Esso, be allowed to use the Esso mark in the five-state area because it confuses the public. This right, to be the only Standard Oil company using the Standard Oil name in the five-state area, Kentucky did not surrender by the 1955 contract.

It is inconceivable to us that Kentucky would give up the valuable right to be the only Standard Oil Company using the Standard Oil name in the five-state area without having specifically discussed such a concession at the negotiation stage or having made it crystal clear in the contract. In effect, such an agreement would not be a license running to Kentucky but a license running to Esso, and would have been contracted for in entirely different terms than the agreement here under consideration.

To say that the management of Kentucky was astonished by Humble's bold assertion that this contract gave it the right independently to enter Kentucky's market under the Esso name would be a masterpiece of understatement. It is probably accurate to say that the only reason Esso had not entered this market before 1961 under the Esso name, eliminating the need to share the profits generated by the Standard Oil reputation with Kentucky, a non-producing marketer, was the fact that it knew Kentucky alone had the right to draw on the Standard Oil magnetism. In 1958, for example, Humble had used the Esso mark on cans of FLIT insecticide marketed in the five-state area independently of Kentucky. When Kentucky objected, Humble withdrew its corporate qualification of "Esso, Inc." in each of the five states in Kentucky's area and discontinued using "Esso" on its FLIT packages or advertising.

At one time Humble began to print "Humble Oil & Refining Company" on cans of Esso motor oil shipped into Kentucky's area. In this way Humble hoped to identify its name rather than Standard Oil's name with Esso. Realizing that some day it might have to compete with Humble, Kentucky objected and this practice was discontinued. Thus it would seem that, until 1961 when the consent decree spurred a search for new meaning in an old contract, even Humble realized that Kentucky had made no such unbelievable concession as is here contended. We hold that by the 1955 contract Kentucky did not give up the right to exclude every distributor other than itself from using the mark Esso in its territory.

On oral argument, Humble also contended that this Court would be violating the intent of the 1961 antitrust consent decree if we prevented its competing with Kentucky under the Esso name. This is precisely the same argument that has been made and rejected numerous times as to the intent of the 1911 dissolution decree. Esso, Inc. v. Standard Oil Co. (of Indiana), 98 F.2d

1, at 8 (8 Cir. 1938); Standard Oil Company (Sohio) v. Standard Oil Company (of Indiana), 252 F.2d 65, at 76 (10 Cir. 1958); Standard Oil Co. of Maine v. Standard Oil Co. of New York, 45 F.2d 309, at 313 (1 Cir. 1930). The antitrust laws require competition, not piracy. The essence of competition is the ability of competing products to obtain public recognition based on their own individual merit. A product has not won on its own merit if the real reason the public purchases it is that the public believes it is obtaining the product of another company. There is not now, nor has there ever been, a conflict between the antitrust laws and trademark laws or the law of unfair competition. The antitrust laws could go no further than to envision Humble's entering the market and competing under one of its non-Standard Oil tradenames and marks. In this way Humble could obtain customers based on its own merits. The judgment of the district court is, therefore, reversed with directions to enter judgment consistent with the foregoing opinion.

Reversed with directions.