PHILIP MORRIS, INCORPORATED,
Plaintiff,

v.

The IMPERIAL TOBACCO COMPANY
(OF GREAT BRITAIN AND IRE-
LAND), Limited, Defendant.

Civ. A. No. 3628.

United States District Court
E. D. Virginia,
Richmond Division.

Nov. 17, 1967.

Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., Leslie D. Taggart, Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff.

Charles L. Reed, Mays, Valentine, Davenport & Moore, Richmond, Va., W. Brown Morton, Jr., J. T. Martin, McLean, Morton & Boustead, Washington, D. C., for defendant.

## MEMORANDUM OF THE COURT

BUTZNER, District Judge.

This court previously held in Philip Morris, Incorporated v. Imperial Tobacco Co., 251 F.Supp. 362 (E.D.Va.1965), that Philip Morris had the exclusive right to use the trademark "PLAYER'S" in the United States. The court also held that Imperial has no right to use PLAYER'S in the United States either alone or in combination with other words. The court will not repeat in this memorandum the findings and the conclusions upon which the decision concerning PLAYER'S rests. However, reference to the earlier memorandum of the court is necessary to understand the issues here.

After the court filed its first memorandum, Imperial was granted leave to amend its pleadings to place in issue the rights of the parties with respect to the words JOHN PLAYER & SONS and the "Nottingham Castle" mark.

Both Philip Morris and Imperial claim the exclusive right to use JOHN PLAYER & SONS in the United States.

John Player, an individual, traded in cigarettes, cigars, and tobacco in his own name prior to 1875 at Nottingham, England. After a period of trading as a partnership with his sons, he incorporated before 1900 under the name, "JOHN PLAYER & SONS, LIMITED." Imperial acquired the assets of JOHN PLAYER & SONS, LIMITED. Its acquisition was recorded in the United States Patent Office on February 9, 1903. Imperial manufactures and sells in England tobacco products under a trade or commercial name including the words, JOHN PLAYER & SONS, e. g. John Player & Sons Branch of The Imperial Tobacco Company (of Great Britain and Ireland), Limited, or similar forms. In all parts of the world except the United Kingdom and the United States, the British American Tobacco Company, not Imperial, has the right to use JOHN PLAYER & SONS.

Prior to 1902, JOHN PLAYER & SONS, LIMITED, sold tobacco products in the United States under its name. These sales were so small and insignificant that a senior official of the firm was not aware of them.

From 1902 until 1911 sales of tobacco in the United States were controlled by the Ogden agreement, which divided the world into exclusive territories for the sale and manufacture of tobacco products. Imperial and American Tobacco Company (Philip Morris' assignor of PLAYER'S) were signatories of this agreement. Antitrust proceedings terminated the Ogden agreement's monopoly in the United States in 1911. The decision of the Court is found in United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911) and the decree in United States v. American Tobacco Co., 191 F. 371 (C.C.S.D.N.Y.1911).

Of course, while the Ogden agreement was in effect, from 1902 to 1911, Imperial sold no JOHN PLAYER & SONS products in the United States to the public. From 1912 until 1956, Imperial's sales of these tobacco products were small. Since 1957 Imperial's sales of tobacco bearing the legend JOHN PLAYER & SONS have increased. It is these sales that Philip Morris protests as an infringement of its trademark PLAYER'S.

The use of a word in a trade name may infringe a trademark. Rice & Hutchins v. Vera Shoe Company, 290 F. 124 (2d Cir. 1923). The test of infringement under the Lanham Act is whether the use of the name in question " * * * is likely to cause confusion, or to cause mistake, or to deceive * * *." 15 U.S.C. § 1114(1) (a). Atlas Supply Co. v. Atlas Brake Shops, Inc., 360 F.2d 16, 18 (6th Cir. 1966).

The court finds that the use of JOHN PLAYER & SONS in connection with the sale of tobacco products is likely to cause confusion or mistake with the sale of tobacco products under the name of PLAYER'S. The reasons for this are not difficult to understand. Imperial, British-American Tobacco Company, American Tobacco Company and Philip Morris—with the acquiescence of Imperial—sought to identify PLAYER'S cigarettes, particularly PLAYER'S Navy Cut cigarettes, with JOHN PLAYER & SONS. They consulted to achieve uniform design of their cartons throughout the world. Their packages carried the trademark PLAYER'S and the trade name JOHN PLAYER & SONS. We need not determine that Imperial is estopped, in view of these efforts, from asserting that the public is not likely to confuse PLAYER'S with JOHN PLAYER & SONS. It is sufficient to find that the campaign to identify the trademark with the trade name has been highly successful.

Imperial contends that prior to 1900 JOHN PLAYER & SONS, LIMITED, had the right to trade in the United States under its name by force of Article 8 of the Paris Convention—the International Convention for the Protection of Industrial Property of 1883. This treaty was adopted in the United States in 1887. Congress has implemented it by 15 U.S.C. § 1126(b) and (g). Section 1126 (g) provides:

"(g) Trade names or commercial names of persons * * * [whose

country of origin extends comparable rights to nationals of the United States by treaty or reciprocation] shall be protected without the obligation of filing or registration whether or not they form parts of marks." [Brackets added]

Whatever exclusive rights Imperial had to JOHN PLAYER & SONS in the United States were terminated by the Ogden agreement. Clause 15 of the agreement provides in part:

"The Imperial Company similarly agrees and shall covenant with the American Company * * * that the Imperial Company will not at any time * * * except as hereinafter expressly excepted, either solely or jointly, with any other person, or persons, company or companies, directly or indirectly, carry on or be employed, engaged, concerned or interested in the business in the United States of a tobacco manufacturer or in any dealing in tobacco * * * or sanction the use of its name in connection with any such business therein same so far as the Imperial Company shall as a member of any other company formed or to be formed with the concurrence of the American Company * * * be interested in the business thereof and save and except that the Imperial Company shall be at liberty to buy and treat tobacco leaf and other materials in the United States for the purpose of its business * * *."

Clause 18 provided that Imperial would not sell or consign any tobacco products to any person or firm in the United States except the American Tobacco Company, or persons or companies designated by it, and Imperial further agreed not to sell any tobacco products to anyone who it had reason to believe would export them to the United States.

It is quite clear from the Ogden agreement that Imperial had no right to use its trading name in the United States except for the limited purpose of buying and treating tobacco leaf and other materials. It had no right to trade in the United States with the public in tobacco

products under its own name or the name of its branches, including JOHN PLAYER & SONS.

The decree of 1911 dissolving the tobacco trust granted to Philip Morris' assignor, American Tobacco Company, the trademark PLAYER'S. Nothing in the decree suggests that the Court restored Imperial to its pre-Ogden status so Imperial under claim of prior right could infringe the trademark PLAYER'S by trading under the name JOHN PLAYER & SONS. It is unthinkable that the Court intended its decree to be an empty vessel.

■ This court holds Imperial does not have prior right to use JOHN PLAYER & SONS in the United States.

■ Imperial's sales of JOHN PLAYER & SONS tobacco products in the United States after 1911 created no rights in Imperial. Neither the Paris Convention nor its implementing provisions, 15 U.S.C. § 1126(b) and (g), was intended to permit a trade name, otherwise entitled to protection, to infringe a valid trademark.

Imperial's reliance on S. C. Johnson & Son, Inc. v. Johnson, 116 F.2d 427 (2d Cir. 1940), aff'd *upon reconsideration,* 175 F.2d 176 (2d Cir. 1949), and Swift & Co. v. T. W. Swift Co., 124 F.Supp. 434 (M.D.N.C.1954) is misplaced. These cases abound with factual distinctions which prevent their application to the controversy between Philip Morris and Imperial. In *Johnson* and *Swift* the courts declined to enjoin the defendants' use of surnames which were similar to the established trading names of the plaintiffs. The defendants' products did not compete with the plaintiffs' or offered only minimum competition. The principal difference, however, lies in the fact that in neither case had the parties entered into a contract comparable to the Ogden agreement. Imperial is precluded from reliance upon *Johnson, Swift,* and similar cases by its covenant with American Tobacco Company not to compete in the United States under the trade name JOHN PLAYER & SONS and at

the same time (as determined by the 1911 decree) in effect conveying to American the most important part of its trading name—the brand or trademark, PLAYER'S.

 From what has been said, it does not follow that Philip Morris is entitled to use JOHN PLAYER & SONS in the United States. Philip Morris could have obtained this right from three sources: (1) The Ogden agreement and the 1911 decree; (2) an irrevocable license from Imperial; or (3) its use of the trade name in the United States. None of these is sufficient to establish Philip Morris' claim. The Ogden agreement did not convey trade names. This was implicitly recognized in the 1911 decree, which provided in part:

> " * * * each company to treat as its own, but only to the extent provided for in said contracts, all *brands* and *trade-marks* which by said contracts it was given the right to manufacture and sell, the said rights having been perpetual and constituting in effect a conveyance of the *brands* and *trade-marks* used for the countries in which they were so used by each of said companies as aforesaid." (Emphasis added.)

 A "trade name" refers to the name of a business. A "brand" or "trademark" refers to the product sold by the business. At times they may overlap. But there is nothing in the decree that indicates the court intended to blur the well-recognized distinction between the terms. If it had intended that the American Tobacco Company was to acquire the English trade names, undoubtedly it would have expressed this drastic provision in definite terms. Actually the court did not intend to prevent Imperial from trading in the United States. The proceedings were instituted to remove trade restrictions.

The evidence does not disclose that Imperial granted Philip Morris or its predecessor, American Tobacco Company an irrevocable license or permission to use JOHN PLAYER & SONS. Although Philip Morris and Imperial appear as adversaries, they have been staunch allies when this role served their mutual advantage. They consulted frequently to achieve uniformity in their packages and public acceptability of their cigarettes. The goal of uniformity led Imperial to consent to Philip Morris' use of JOHN PLAYER & SONS in the legend "Established by John Player & Sons." Philip Morris accepted Imperial's permission, and neither American Tobacco Company nor Philip Morris claimed ownership of the trade name JOHN PLAYER & SONS. This is in sharp contrast to their claims of ownership to the trademark PLAYER'S.

Philip Morris' use of JOHN PLAYER & SONS was more in the nature of a trademark than a trade name, especially after the Federal Trade Commission required Philip Morris to show that its Player's Navy Cut cigarettes were manufactured in the United States. Philip Morris & Co., Ltd., Incorporated, 32 F.T.C. 278 (1940). Philip Morris and Imperial were not related companies within the meaning of 15 U.S.C. § 1127. Imperial could not legitimately control Philip Morris in respect to the nature and quality of its cigarettes. Ordinarily under these circumstances Imperial's consent that Philip Morris could use JOHN PLAYER & SONS would constitute an abandonment of the mark. 15 U.S.C. §§ 1064, 1127. Cf. Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 366 (2d Cir. 1959).

██ It was the decree of 1911 that prevented them from being associated as related companies. Despite the decree, Philip Morris voluntarily conformed its cigarettes to Imperial's standards. Although Philip Morris' formula was not identical to Imperial's, both parties were satisfied with the uniformity they achieved. There is nothing in the evidence to suggest that Imperial would not have withdrawn its consent to use JOHN PLAYER & SONS if Philip Morris deviated substantially from Imperial's standards. Thus, although the decree of 1911 prevented Philip Morris and Im-

perial from enjoying the status of related companies, Philip Morris' voluntary acquiescence in Imperial's standards should not permit Philip Morris to appropriate for its own use that which it induced Imperial to permit it to use. Philip Morris' permissive usage in the past does not establish a right to hostile usage in the future. Imperial's acquiescence in Philip Morris' use of JOHN PLAYER & SONS did not create new rights in Philip Morris. In Menendez v. Holt, 128 U.S. 514, 524, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888), the Court observed:

> "Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license.' Duer, J., Amoskeag Mfg. Co. v. Spear & Ripley, 2 Sandf., N.Y., 599."

■ Imperial trades in the United States. The geographical area of its market coincides with Philip Morris'. Both companies deal in tobacco products and both sought to associate the trademark PLAYER'S with the trade name JOHN PLAYER & SONS. Imperial is entitled to restrain Philip Morris from appropriating its trade name. Undoubtedly the order of the Federal Trade Commission in Philip Morris & Co., Ltd., Incorporated, 32 F.T.C. 278 (1940), eliminated the suggestion that Philip Morris' PLAYER'S cigarettes originated in England, nevertheless Philip Morris' use of JOHN PLAYER & SONS closely identifies its product with some of Imperial's products. Both are English type cigarettes. Imperial is entitled to the protection afforded by Section 8 of the Paris Convention, and 15 U.S.C. § 1126(b) and (g) to prevent this unfair competition.

Closely related to the trade name, JOHN PLAYER & SONS, is the mark depicting a castle on a bluff with the legend, "Notm Castle." Both Philip Morris and Imperial claim the right to exclusive use of this mark in the United States.

On November 26, 1901, JOHN PLAYER and SONS LIMITED (Imperial's predecessor) registered in the United States Patent Office (No. 37,350) a mark which included a picture of a castle with considerable writing, including the legend:

"Castle Cavendish Works
Nottingham"

Although the mark was submitted in connection with Drumhead cigarettes, Amendment No. 3 of the application shows that the essential feature of the mark is the " * * * representation of Nottingham Castle." The assignment of the trademark and registration to Imperial were recorded in the United States Patent Office February 9, 1903. The registration was renewed by Imperial in 1931 and in 1951. The registration has neither been cancelled nor abandoned.

Under the Ogden agreement, American Tobacco Company sold tobacco products in the United States bearing this mark. The 1911 decree terminating the Ogden agreement did not list the brands and trademarks that passed to the various companies. The companies, however, carefully stated their claims of ownership.

American Tobacco Company never claimed the Nottingham Castle mark. It did not specify the mark when it assigned its rights to Philip Morris. Philip Morris never claimed the mark until this litigation. Imperial consistently claimed the mark and renewed its registration. This is in sharp contrast to the claim of ownership in PLAYER'S and the sailor head device made by American Tobacco Company and Philip Morris.

■ The construction which the parties gave to the 1911 decree is not controlling, but it is persuasive. In respect to the Nottingham Castle mark, no sound reason exists for departing from the scope and limitations the parties accorded the decree. The court concludes that Philip Morris did not acquire the mark by the 1911 decree.

Imperial did not abandon its Nottingham Castle mark. Its United States sales of products bearing the mark, although small, evidenced no intention to abandon. Philip Morris' reliance upon 15 U.S.C. § 1120, which creates liability for false or fraudulent registration of a trademark, is misplaced. Imperial's affidavits supporting its application for renewal in 1931 and 1951 were not false or fraudulent. The mark was used in commerce. Imperial's first renewal of the registration in 1931 was published by the Patent Office. The status of this mark and its registration was specifically called to plaintiff's attention in 1948. Finally, this registration was republished under the provisions of the Trademark Act of 1946, 15 U.S.C. § 1062(c), on July 22, 1952 in the Patent Office Official Gazette. This gave Philip Morris a further opportunity for five years to cancel the registration (15 U.S.C. § 1064). This right has now expired. It cannot now be heard to claim rights in this mark.

Philip Morris has also used the Nottingham Castle mark on packages of PLAYER'S cigarettes. Imperial permitted use of its mark. It was to the mutual advantage of Imperial and Philip Morris to voluntarily conform their packages and their product.

There is nothing in the record to suggest that Imperial would not have withdrawn its consent for Philip Morris to use the mark if Philip Morris deviated substantially from Imperial's standards. Although, as the court has mentioned, the 1911 decree prevented Philip Morris and Imperial from being related companies, Philip Morris' voluntary acquiescence in Imperial's standards should not permit Philip Morris to appropriate for its own use the mark which it induced Imperial to permit it to use.

Imperial never granted Philip Morris an irrevocable license to use its Nottingham Castle mark. It has the right to withdraw its consent. Imperial's use of the Nottingham Castle mark in the United States will not infringe any trademark owned by Philip Morris.

The public interest requires preservation of the integrity of the antitrust proceedings that terminated the tobacco monopoly. Within the framework of those proceedings the rights of the parties to their trademarks, brands, and trade names must be protected. These goals are not incompatible. Standard Oil Co. (Kentucky) v. Humble Oil & Refining Co., 363 F.2d 945 (5th Cir. 1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed.2d 545 (1967).

Imperial can trade in the United States using its trademarks, its trade name, and the trade name of its branches which do not infringe Philip Morris' trademarks. The antitrust proceedings did not strip from Philip Morris the protections to which its trademarks are entitled. But Philip Morris cannot use without lawfully granted permission Imperial's branch trading name or mark.

The court concludes:

1. Philip Morris never acquired the right to non-permissive use of JOHN PLAYER & SONS.

2. Imperial's use of JOHN PLAYER & SONS infringes Philip Morris' trademark, PLAYER'S, and consequently Imperial cannot use this trade name in the United States.

3. Philip Morris never acquired the right to non-permissive use of the Nottingham Castle mark.

4. Imperial has the exclusive right to use its Nottingham Castle trademark in the United States.

5. Before the counterclaim was amended the parties stipulated Imperial was damaged in the amount of $1.00. The subsequent proceedings on the amended pleadings show no additional liability or damage.

6. The court previously denied Philip Morris' prayer for attorneys' fees. Nothing raised by the amended counterclaim or the subsequent litigation alters this denial.

7. Philip Morris has not prevailed on the Nottingham Castle issue. Accordingly the previous award of costs will be modified. Philip Morris is entitled to recover three-fourths of its costs to be taxed by the Clerk of this court.