**PHILIP MORRIS INCORPORATED,**
Appellee,

v.

**The IMPERIAL TOBACCO COMPANY**
**(of Great Britain and Ireland),**
**Limited, Appellant.**
**No. 12072.**

United States Court of Appeals
Fourth Circuit.

Argued May 10, 1968.

Decided Aug. 23, 1968.

Rehearing Denied Oct. 3, 1968.
Certiorari Denied Feb. 24, 1969.
See 89 S.Ct. 875.

W. Brown Morton, Jr., New York City (McLean, Morton & Boustead, New York City, Charles L. Reed, and Mays, Valentine, Davenport & Moore, Richmond, Va., on the brief) for appellant.

Leslie D. Taggart, New York City (Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., Watson, Leavenworth, Kelton & Taggart, and Thomas F. Ahrensfeld, New York City, on the brief) for appellee.

Before SOBELOFF, WINTER and CRAVEN, Circuit Judges.

SOBELOFF, Circuit Judge:

Imperial Tobacco Company, exclusive manufacturer and distributor of "Player's" tobacco products in the United Kingdom and Ireland, appeals from the District Court's holding that in this country Philip Morris, Inc., is the owner of the "Player's" trademark,[1] that Imperial may not sell its "Player's" products under that name in the United States, and that neither is entitled to use in this country the tradename "John

---

1. In 1951, Philip Morris, as owner of the brand, applied to register "Player's" as a trademark for cigarettes. The registration was issued by the United States Patent Office the following year.

The mark consists of the word "Player's" and the face of a sailor pictured inside a life buoy.

Player & Sons." [2] Finding the District Court's reasoning completely persuasive and its conclusions unimpeachable, we affirm on the basis of its two opinions, 251 F.Supp. 362 (E.D.Va.1965) and 282 F.Supp. 931 (E.D.Va.1967).

Imperial contends that Philip Morris is simply its perpetual licensee for the brand "Player's Navy Cut," and therefore Imperial is free to sell any other "Player's" product in the United States. Its position is premised upon a 1902 agreement between Imperial and American Tobacco Company, Philip Morris's assignor and predecessor in interest.[3] By that agreement, American had obtained the exclusive right to market "Player's" cigarettes in the United States while Imperial had a similar right with regard to American's products in England. Each company was to supply its formulas and recipes to the other, and each was to retain a right of supervision over the other as to its own brands.

Under the agreement, American sold in the United States a brand of cigarettes known as "Player's Navy Cut," the words "navy cut" being known in the trade as a type of tobacco. This arrangement continued until 1911, when the United States Supreme Court, in breaking up the huge tobacco trust, held that the 1902 agreement violated the Sherman antitrust act. United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

Evincing "a proper regard for the vast interests of private property which may have become vested" as a result of stock acquisitions and such agreements as the 1902 pact, the Supreme Court remanded the case to the Circuit Court for the formulation of the necessary dissolution order. Pursuant to this mandate from the Supreme Court, the Circuit Court terminated the 1902 agreement but provided that "each company [would] treat as its own, but only to the extent provided for in said contracts, all brands and trademarks which by said contracts it was given the right to manufacture and sell, the said rights having been perpetual and constituting in effect a conveyance of the brands and trademarks used for the countries in which they were so used by each of said companies * * *." United States v. American Tobacco Co., 191 F. 371, 418 (C.C.S.D.N.Y.1911).

The District Court in the instant case correctly interpreted the decree and the resulting document of rescission to mean that from that time all ties between American and Imperial were severed. It read the phrase "to the extent provided for in said contracts" as referring to the geographic limitations in the agreement, and thus held that as a result of the decree American was the fee simple owner in this country of the Imperial brands it had sold here while Imperial owned outright in England the American brands it had sold there. Imperial's indefensible position is that this decree simply continued in effect the perpetual license which had existed since 1902. Under its theory, the combination held violative of the antitrust laws in 1911 persists to this day, and Imperial has a right to control American's assignee as to the manufacture of "Player's" cigarettes. According to appellant, it also follows that Imperial is the owner of the "Player's" trademark in this country and may market other tobacco products under that name.

---

2. The court also held that Imperial has the exclusive right to use the "Nottingham Castle" trademark in the United States. Philip Morris has not appealed from this adverse ruling.

3. In 1926, American executed a contract, agreeing to: "sell, assign, transfer and set over until Philip Morris-International Corporation * * * the brand of cigarettes known as "Player's" or "Player's Navy Cut" * * * and the business in connection therewith together with the goodwill thereof * * * for the United States of America * * * and the exclusive right thereto; TO HAVE AND TO HOLD the foregoing property unto Philip Morris-International Corporation, its successors and assigns absolutely and forever."

Without offering an acceptable alternative interpretation of the Circuit Court's language, Imperial argues that to construe it as the District Court has done is to produce an anti-competitive effect since Imperial is now excluded from the American market. Of course, it is not our province to review the action of the Circuit Court some fifty-seven years ago. Thus, even if Imperial's contention were correct, we would be precluded from altering the clear intent of that decision. In any event, we see no greater anti-competitive effect here than in any other case upholding a trademark as valid and prohibiting its infringement. Imperial is of course free to sell its other products in this country and may even sell its "Player's" products if it uses a non-infringing trademark. See Standard Oil Co. (Ky.) v. Humble Oil & Refining Co., 363 F.2d 945, 954 (5th Cir. 1966).

For the reasons fully expressed by the District Court, the judgment is

Affirmed.