405 F.2d 803
 160 U.S.P.Q. 289
 HUMBLE OIL & REFINING COMPANY, a Corporation, Esso,
Incorporated, a Corporation, and Standard Oil
Company, a New Jersey Corporation, Appellants,
v.
AMERICAN OIL COMPANY, a Corporation, and Standard Oil
Company, an IndianaCorporation, Appellees.
 No. 18596.
 United States Court of Appeals Eighth Circuit.
 Jan. 9, 1969.
 
 David W. Peck, of Sullivan & Cromwell, New York City, for appellants, Arthur H. Dean, Roy H. Steyer and Richard E. Carlton, New York City, and Walter R. Mayne, Thomas Rowe Schwarz and P. Terence Crebs, of Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., and Dillard Baker, Houston, Tex., with him on the brief and reply brief.
 Richmond C. Coburn, of Coburn, Croft & Kohn, St. Louis, Mo., for appellees; Alan E. Popkin, St. Louis, Mo., and Richard J. Farrell, Ernest L. Godshalk, L. Bates Lea, John W. Sherman and Paul B. Uhlenhop, Chicago, Ill., and Walter T. Kuhlmey, Reuben L. Hedlund and Donald W. West, of Kirkland, Wllis, Hodson, Chaffetz & Masters, Chicago, Ill., with him on the brief.
 Before BLACKMUN, GIBSON and LAY, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 This appeal provides yet another chapter in the story of Standard Oil and of the many Standard Oil controversies which have added color to the body of our law of trademarks, trade names, and restraint of trade.[1]
 
 
 2
 The plaintiffs appeal from a judgment of the district court dismissing their complaint (filed July 9, 1963) by which they seek under Rule 60(b), Fed.R.Civ.P., to modify and amend that court's injunction issued July 8, 1937, and affirmed by this court in Esso, Inc. v. Standard Oil Co., 98 F.2d 1 (8 Cir. 1938).
 
 The plaintiffs are three:
 
 3
 Standard Oil Company, a New Jersey corporation, hereinafter called Jersey Standard or Jersey. The corporation was not an original party-plaintiff but was made such, on motion of the defendants, by district court order pursuant to Rule 19(a), Fed.R.Civ.P.
 
 
 4
 Jersey's wholly-owned subsidiary, Humble Oil & Refining Company, a Delaware corporation and successor to Standard Oil Company of New Jersey, a Delaware corporation. Since Humble became Jersey's wholly-owned subsidiary in 1960, it has been its parent's nationwide marketing affiliate in the United States. Jersey itself does not carry on any marketing operations. Humble's wholly-owned subsidiary, Esso, Incorporated, a Delaware corporation.
 
 The defendants are two:
 
 5
 Standard Oil Company, an Indiana corporation, hereinafter called Indiana Standard or Indiana. Indiana's wholly-owned subsidiary, American Oil Company, a Maryland corporation. Since January 1, 1961, American has conducted all of Indiana's marketing operations in the United States.
 
 
 6
 What the plaintiffs seek, as the amended complaint asserts, is 'to permit Humble to use its trademark ESSO and marks containing 'Esso' in the marketing by Humble of its petroleum products in fifteen midwestern states in which American now markets.' Judge Meredith, after a full trial, denied the relief requested (a) on the merits and (b) by application of the doctrine of unclean hands. Accordingly, he dismissed the complaint and 'continued in full force and effect' the 1937 decree. The district court's findings, conclusions, and supporting memorandum are reported as Humble Oil & Refining Co. v. American Oil Co., 259 F.Supp. 559 (E.D.Mo.1966).
 
 
 7
 Background litigation. 1. In 1909 the United States Circuit Court for the Eastern District of Missouri, with Judges Walter H. Sanborn, Van Devanter (soon thereafter Mr. Justice Van Devanter), Hook, and Adams (being all the circuit judges in the Eighth Circuit's then geographical area) constituting the court, issued its opinion holding that Standard Oil Company of New Jersey (which owned controlling interests in a number of other Standard Oil companies, including Indiana, and other corporations), seven individuals and 37 additional corporate defendants, including Indiana, were 'in restraint of trade and commerce in petroleum and its products among the several states', in violation of the Sherman Act. By its decree the court enjoined the continuance of that violation. United States v. Standard Oil Co., 173 F. 177, 197-200 (C.C.E.D.Mo.1909).
 
 
 8
 2. On appeal, the Supreme Court of the United States, in an opinion by Mr. Chief Justice White, affirmed the circuit court's decree 'except as to * * * minor matters.' Standard Oil Co. v. United States, 221 U.S. 1, 82, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In so doing the Court recognized that the circuit court's decree 'commanded the dissolution of the combination, and therefore in effect, directed the transfer by the New Jersey corporation back to the stockholders of the various subsidiary corporations * * * of the stock which had been turned over to the New Jersey company * * *.' 221 U.S. at 78, 31 S.Ct. at 523. The first Mr. Justice Harlan separately concurred in part but dissented as to the 'minor matters.' 221 U.S. at 82-106, 31 S.Ct. 502.
 
 
 9
 3. Accordingly, the circuit court modified its decree on July 29, 1911; the holding company distributed the stocks; and the dissolution of the Standard Oil Trust was effected. See United States v. Standard Oil Co., 47 F.2d 288, 289 (E.D.Mo.1931). The practical result of this was that each of the several Standard Oil companies, which had been part of the Trust, thereafter operated separately and independently and with exclusive use of the Standard name in that area of the nation which had been allotted to it originally. 221 U.S. at 77, 31 S.Ct. 502. See Fry v. Layne-Western Co., 282 F.2d 97, 106 (8 Cir. 1960). Indiana's area at the time consisted of 11 states, namely, Michigan, Indiana, Wisconsin, Illinois, Minnesota, Iowa, Missouri, North Dakota, South Dakota, Kansas, and Oklahoma.
 
 
 10
 4. This division and subsequent natural growth understandably led to competition and this in turn to vigorously contested lawsuits over the right to use the Standard Oil name and its various derivatives and abbreviated forms. Some of these were controversies between Standard Oil companies of the original group; most, however, were between an established Standard Oil company and an outsider who sought to employ the name. The rulings in these cases consistently have been to the effect that the name Standard Oil has a secondary meaning in the trade and that, in the hands of the original user, it is entitled to protection against unfair use and unfair competition in the area where that user operates. Judge Meredith described it well when he said,
 
 
 11
 The particular Standard Oil Company which first and continuously used the name 'Standard' and derivatives thereof in a particular trade area had the exclusive right to use that name and all derivatives therefrom to the exclusion of the other Standard Oil Companies and to the exclusion of all strangers who attempted to use the name. 259 F.Supp. at 560.
 
 
 12
 The reported cases include Standard Oil Co. (Indiana) v. Michie, 34 F.2d 802 (E.D.Mo.1929); Standard Oil Co. of New York v. Standard Oil Co. of Maine, 38 F.2d 677 (D.Maine 1930), modified and aff'd, 45 F.2d 309 (1 Cir. 1930); Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 56 F.2d 973 (10 Cir. 1932); Standard Oil Co. of Colorado v. Standard Oil Co. (Indiana), 72 F.2d 524 (10 Cir. 1934), cert. denied, 293 U.S. 620, 55 S.Ct. 216, 79 L.Ed. 708; Esso Standard Oil Co. v. Bazerman, 99 F.Supp. 983 (E.D.N.Y.1951); Standard Oil Co. (Indiana) v. Standard Oil Co. of North Dakota, 123 F.Supp. 227 (D.N.D.1954); Standard Oil Co. (Indiana) v. Standard Oil Co. (Ohio), 141 F.Supp. 876 (D.Wyo.1956), aff'd 252 F.2d 65, 76 A.L.R.2d 600 (10 Cir. 1958); Esso Standard Oil Co. v. Standard Oil Co. of North Carolina, 112 U.S.P.Q. 265 (M.D.N.C.1956); and Esso Standard Oil Co. v. Standard Oil Co. of New England, 170 F.Supp. 71 (D.N.H.1958). A decision initially to the contrary, evidently the only one, involving special facts, is Humble Oil & Refining Co. v. Standard Oil Co. (Kentucky), 229 F.Supp. 586 (S.D.Miss.1964); but this was reversed, 363 F.2d 945 (5 Cir. 1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed.2d 545, and the final disposition of that litigation is in line with the other cited cases.[2]
 
 
 13
 It should perhaps be noted, for what it may be worth, that a Jersey affiliate, Esso Standard Oil Company, was a party in a number of the outsider cases and that it took the position in those cases, some of them within a decade of the institution of the present lawsuit, that the exclusive right to the Standard Oil Name or derivatives in the territory in question belonged to it. It has taken a like position in registration and other proceedings.
 
 
 14
 5. It was the United States District Court for the Eastern District of Missouri and this court, however, which entertained the earliest litigation between constituent companies of the old Trust. That case was the one which resulted in the 1937 decree and its affirmance here. In 1935 Esso, Incorporated, opened three gasoline service stations in Saint Louis, Missouri, within the territory historically inhabited by Indiana. Indiana sued (Civil Action No. 11407 in the Eastern District) to enjoin Esso, Incorporated, from using 'ESSO', alone or in combination, in Indiana's multistate area. The late Judge Moore ruled in favor of Indiana and on July 8, 1937, entered a decree, the injunctive portion of which is set forth in the margin.[3] The court's supportive findings, described as 'elaborate and in considerable detail', are summarized in the affirming opinion of this court. Esso, Inc. v. Standard Oil Co., supra, 98 F.2d at 3-4. We place in the margin pertinent portions of those findings and conclusions[4] and pertinent portions of Judge Gardner's opinion[5] describing the arguments advanced by Esso, Incorporated, and containing this court's response thereto. 98 F.2d at 5-7.
 
 Thus the matter rested 30 years ago.[6]
 
 15
 Other background material. 1. After the dissolution of the Standard Oil Trust, some of the companies constituent thereto, including Jersey and Indiana, expanded their respective operations beyond their originally allotted territories. For the most part, however, these expansions were under names and marks other than Standard Oil or its derivatives or abbreviations.
 
 
 16
 2. On November 27, 1923, the mark ESSO was registered as Trade-Mark 176,408 in the United States Patent Office by Standard Oil Company (New Jersey), a New Jersey corporation. The registration was renewed November 27, 1943, to Standard Oil Company of New Jersey, a Delaware corporation, later, by change of name, Esso Standard Oil Company, a Jersey affiliate.
 
 
 17
 3. Esso and Indiana were the only actual parties to the litigation resulting in the 1937 decree and its affirmance. By the pleadings, however, Humble and American acknowledge that each of them is necessarily 'interested in and affected by' that decree.
 
 
 18
 4. Indiana was incorporated in the State of Indiana in 1889. In its multistate area Indiana has used the Standard Oil name continuously since its incorporation. As hereinabove noted, its territory at the time of the 1911 Supreme Court decision consisted of 11 states in the Midwest. Three more, Montana, Wyoming, and Colorado, had been added by the time of the 1937 decree. Still another, Nebraska, was added in 1939 when Indiana acquired Standard Oil Company of Nebraska and rights to the name in that state. Thus Indiana's primary area of operation, where it or its predecessors have used the Standard Oil name generally and (except for litigation hereinabove described) without question by other Standard Oil companies, is a 15-state contiguous complex in the central or midwestern part of the nation.
 
 
 19
 5. By 1960 Humble, as a result of the merger into it of other Jersey subsidiaries, was marketing in 35 states and announced its intention to market nationwide.
 
 
 20
 6. By the time Jersey and Indiana, in 1960 and 1961 respectively, placed themselves in positions to market nationwide through single subsidiaries, it had become obvious that it was desirable to attain, if possible, uniform identification of stations and products.
 
 
 21
 7. In contrast, at the time the 1937 decree was entered, Indiana, in its then 14-state area, was conducting its station operations with its own distinctive red, white and blue color scheme under Standard names and trademarks, but subsidiaries, marketing outside that area, were operating under different names, symbols and color schemes. About 1946 Indiana moved toward uniformity by the adoption, for itself and subsidiaries, of a sign consisting of a red, white and blue oval and torch. This was brought to a head with the 1961 merger of the marketing companies into the wholly-owned American. The torch and oval sign continued to be used with the word 'Standard' therein in the 15-state area and the word 'American' elsewhere. Uniformity of station design, slogans, and the like, was also accomplished. Indiana's prior use of the initials S O, which had been extensive in 1937, began to lessen.
 
 
 22
 8. A like development took place on the Jersey side. In the thirties, the name ESSO was in use in 18 states (Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Virginia, North Carolina, South Carolina, Tennessee, Louisiana, and Texas), the District of Columbia, Canada, and 135 foreign areas.[7] The plaintiffs' brief describes ESSO as 'without any doubt one of the best known trademarks in the world, and a recognized symbol at airports and service stations' here and abroad. The plaintiffs assert that ESSO belongs to and is used exclusively by Jersey, Humble, and their affiliates and cannot be used anywhere by Indiana or American without Humble's or Jersey's permission.
 
 
 23
 With the 1960 merger Humble adopted a uniform design for its service stations. This featured the name Humble, the slogan 'Happy Motoring', and a red, white and blue color scheme. The nationwide use of ESSO, however, was complicated by the 1937 injunction in the 15-state midwest area and elsewhere where the principle of that injunction was considered to be applicable by other Standard Oil companies, and by the settlement stipulation mentioned in paragraph 11, infra, with Standard of California and Standard of Texas. Humble therefore adopted the name 'ENCO', from 'ENergy COmpany', for use in those areas of complication.
 
 
 24
 9. Obvious factors promoting this trend toward uniformity were the propensity for travel in the United States and national advertising.
 
 
 25
 10. The Standard name came to be eliminated from Humble's marketing operations by 1961. Jersey management testified to this effect at the trial and further stated that neither Jersey nor Humble now had any intention of resuming the use of the Standard name in United States marketing and would not protest if American or any other Standard Oil company were to use the Standard name in any area where Humble uses ESSO. Apparently this policy decision was not without some disagreement in Jersey's executive structure.
 
 
 26
 11. Other Standard Oil companies moved in the same direction. Standard of California continued its use of the Standard name in nine states (Texas, New Mexico, Arizona, California, Nevada, Oregon, Washington, Idaho, and Utah) but in the late fifties adopted a national identification with its red, white and blue Chevron symbol. That company also used the name CALSO in the Midwest and in the East until about that time and did so without ultimate objection from Jersey. In 1954 Humble brought an action in a Texas federal court, as it states, 'to protect ESSO against confusing advertising by Standard of Texas (a Standard of California subsidiary) of the letters S.O.' This suit was settled by a stipulation between Humble, California, and Texas. Thereby Humble recognized the right of Texas to use the Standard name in Texas and New Mexico, and Texas recognized the right of Humble to use ESSO in Texas. Further, Humble agreed that it would not use ESSO in states where California or Texas had an active prior use of the Standard name.[8]
 
 
 27
 12. Standard Oil Company, an Ohio corporation, uses SOHIO in its traditional area which is the State of Ohio. But it also operates in Michigan, Pennsylvania, and Kentucky under the mark BORON. Its service station design is generally the same for all four states.
 
 
 28
 13. California Standard and Indiana arrived at an understanding in 1955. Each agreed that it would not use marks or names with the letters S O in the other's area. Each, however, also agreed that the other could use the Standard name in advertising media which had as much as 15% Circulation in the area where the other used the Standard name. This agreement served to terminate California's approximately 20-year use of the name CALSO in the Midwest.
 
 
 29
 The starting point. In their brief the plaintiffs state that they, 'in this action to modify the 1937 injunction, do not dispute in any way the validity of the findings at that time or the holding based on such findings.' Regardless of whether, at this late date, the plaintiffs would or would not have a choice in that matter,[9] this acknowledgment on the part of the plaintiffs necessarily provides a starting point. Judge Moore's 1937 findings and conclusions, certain of which we have set forth in footnote 4, supra, embrace, among other things, a) an admission that the Standard name, as used where each Standard Oil company operated, indicated only the company there operating; b) representations to various courts by plaintiffs' predecessor-affiliates to that effect; c) the identity and equivalency of ESSO with S O and Standard Oil, and the predecessor-affiliates' court representations to that effect; d) confusion on the part of the buying public; and e) an estoppel of the present plaintiff, Esso, Incorporated.
 
 
 30
 This is, indeed, a disadvantageous and precarious starting point, albeit one of 30 years ago, for the present plaintiffs. Using football phrases, it is poor field position and late in the game.
 
 
 31
 The plaintiffs' argument. It is argued that, since the litigation of 30 years ago, 'a fundamental factual change has occurred.' The goodwill and reputation of the Standard Oil name in the 15-state area is no longer attributable to Indiana but is actually that of all the Standard Oil companies. The name is no longer distinctive. Further, ESSO itself has become distinctive and 'is no longer generally regarded as denoting 'Standard Oil." Thus, the controlling facts have changed and, since this is so, 'the basis for holding that the use of ESSO by Humble in the midwest would constitute unfair competition with or infringement of appellees' use of Standard no longer exists.' The change is attributable to 'present marketing, trademark and environmental conditions.' The allocation of the goodwill of the Standard name 'on a territorial basis involves restraints on effective competition contrary to trademark law and the public policy of the antitrust laws.'
 
 
 32
 Further, the basic premise of the decision in the district court is not that the only Standard Oil reputation known to the public in the 15-state area is that of Indiana but rather that the prior decisions have established that each Standard Oil company retained the 'exclusive right' to use the name in its 'particular trade area.' Again, the fundamental question is 'whether today, in contrast to 1937, the Standard Oil reputation in the subject area is exclusively' that of Indiana and that this would have to be the basis for any holding that Indiana is still entitled to a monopoly of the reputation of the name in the Midwest.
 
 
 33
 Thus, it is suggested, Indiana is really trading on the goodwill of all the Standard companies.
 
 
 34
 The litigation instituted by Indiana against Standard of Ohio relating to Ohio's use of SOHIO in Michigan was begun in 1954. The plaintiffs would explain and differentiate the Tenth Circuit's decision, supra, 252 F.2d 65, on the ground that the finding there, to the effect that the Standard Oil reputation in the area involved was only that of Indiana, was based on the mutual concession, 252 F.2d at 70, that each party litigant had the exclusive right to use the Standard name in its own territory. Thus, the plaintiffs say, the Wyoming federal district court and the Tenth Circuit were not asked to determine the fundamental question whether the Standard Oil reputation in Michigan was in fact isolated to Indiana.
 
 
 35
 The plaintiffs would also distinguish the Fifth Circuit's decision, supra, 363 F.2d 945. Although recognizing that the Court of Appeals held that the district court's findings there as to the absence of public confusion between ESSO and Standard Oil were clearly erroneous, 363 F.2d at 948, the plaintiffs assert that the respect in which the court found confusion is significant. It is said that the confusion is with the general name Standard Oil and not with Standard of Kentucky; that the court expressly recognized that the goodwill and the Standard Oil name is attributable to all the Standard Oil companies; and that all the companies must share the Standard Oil idea or meaning. 363 F.2d at 950-952. It is thus argued that the Fifth Circuit recognized that the Standard Oil reputation and goodwill is a shared reputation and goodwill. It is said, however, that the court did not focus on the essential fact that Indiana in 1937 had a right to foreclose the use of ESSO in its 14-state area only because to the public the Standard Oil name in that area meant Indiana exclusively. Thus the plaintiffs would utilize the Fifth Circuit's decision as authority for shared reputation and shared goodwill but would question it as misguided authority for monopoly of that reputation and goodwill in a particular area.
 
 
 36
 The legal standard. A court of equity has power 'to modify an injunction in adaptation to changed conditions.' This is so whether the power is or is not expressly reserved in the decree and 'whether the decree has been entered after litigation or by consent.' United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). In that case the Supreme Court reversed the trial court's modification of its earlier injunction. Two dissenters stressed changed competitive conditions and 'discouraging operating losses' of those theretofore restrained. 286 U.S. at 120-123, 52 S.Ct. 460. But the four-justice in an opinion by Mr. Justice Cardozo, majority (three justices took no part), pronounced the applicable standards:
 
 
 37
 'There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.
 
 
 38
 'What was then solemnly adjudged as a final composition of an historic litigation will not lightly be undone at the suit of the offenders, and the composition held for nothing.' 286 U.S. at 119-120, 52 S.Ct. at 464.
 
 
 39
 We glean, from this, certain factors of importance: (1) that, where modification and amendment of an existing decree is under consideration, there are 'limits of inquiry' for the decree court and for the reviewing court; (2) that the inquiry is 'whether the changes are so important that dangers, once substantial, have become attenuated to a shadow'; (3) that the movants must be 'suffering hardship so extreme and unexpected' as to be regarded as 'victims of oppression'; and (4) that there must be 'nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions.' Placed in other words, this means for us that modification is only cautiously to be granted; that some change is not enough; that the dangers which the decree was meant to foreclose must almost have disappeared; that hardship and oppression, extreme and unexpected, are significant; and that the movants' task is to provide close to an unanswerable case. To repeat: caution, substantial change, unforeseenness, oppressive hardship, and a clear showing are the requirements.
 
 
 40
 The Supreme Court, in subsequent opinions, continues to recognize an equity court's power to modify and amend and yet gives no indication of any retreat from the requirements of Swift. See, for example, System Federation No. 91, Ry. Emp. Dept., AFL-CIO v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); Columbia Artists Management Inc. v. United States, 381 U.S. 348 (1965), and the dissent at 352; and United States v. United Shoe Machinery Corp., 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968), where it was said:
 
 
 41
 Swift teaches that a decree may be changed upon an appropriate showing, and it holds that it may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree * * * have not been fully achieved.
 
 
 42
 This court, too, has recognized the same principles with a reference to 'significant changes in conditions not foreseeable at the time the injunction was granted,' thus emphasizing change and unforeseeability. Bowdil Co. v. Central Mine Equip. Co., 216 F.2d 156, 160 (8 Cir. 1954), cert. denied, 348 U.S. 936, 75 S.Ct. 356, 99 L.Ed. 734. See Hygrade Food Prods. Corp. v. United States, 160 F.2d 816, 819 (8 Cir. 1947).
 
 
 43
 At this point we advert to the plaintiffs' brief and to the following statements which it contains:
 
 
 44
 'It follows from these principles that a party is entitled to modification when the original injunction, based on a different set of facts, could not properly have been entered on the state of facts that now exists. * * *
 
 
 45
 'The essential issue before the Court is whether, on the facts shown to exist today, which were demonstrated in an exceptionally full record, and pursuant to the policy of the trademark and antitrust laws, the Court would issue the injunction that it issued in 1937. * * *'
 
 
 46
 We feel that these statements, standing alone, are not consistent with the language and with what we regard as the requirements of Swift. As Mr. Justice Cardozo said in Swift, 286 U.S. at 119, 52 S.Ct. at 464, 'We are not framing a decree.' We are confronted here not with a question of the granting of injunctive relief but with the question of the withdrawal or modification of injunctive relief granted in the past. It is in the latter situation-- the one which confronts us-- where the Cardozo precepts are the operating guidelines. Despite the quoted words from their brief, we really do not understand the plaintiffs to argue otherwise.
 
 
 47
 The evidence. We must agree with the defendant-appellees that the controlling issue, in both the 1937 litigation and the present proceeding, is an issue of fact, namely, whether the use of ESSO in the 15-state area would occasion confusion in the buying public.
 
 
 48
 This being so, it follows that the usual hornbook rules have application, namely, that findings are not to be set aside unless clearly erroneous and 'only upon clear demonstration that they are without substantial evidentiary support or that they are induced by an erroneous view of the law,' and that a finding is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' Rule 52(a), Fed.R.Civ.P.; Cole v. Neaf, 334 F.2d 326, 329 (8 Cir. 1964); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 49
 The key findings of fact made by Judge Meredith in the present case are the following:
 
 
 50
 The use of the name 'Standard' and all derivatives thereof belongs to Standard Oil (Indiana) in the midwest states as this Court held in 1937. To permit this decree to be modified on the evidence presented to this Court would cause the motoring public a great deal of confusion and would cause a substantial loss to the defendants. Their customers would not know the difference between the Standard torch and oval as used in the midwest and the Esso in the oval as used by the plaintiffs. The motoring public in the midwest would be buying plaintiffs' products thinking they were defendants'. * * * While the defendants in this case have had some change in the use of the initials 'S O' and 'S O C O' from 1937 to the present date, there has been a substantial and continued use of these initials. In the early stages of this case the court reporters had great difficulty in determining whether the lawyers were saying 'S O' or 'Esso'. When pronounced they sound identical. Both mean Standard Oil. 259 F.Supp. at 566.
 
 
 51
 Thus Judge Meredith found essentially the same facts for the present day as Judge Moore did for his day, namely, that ESSO would cause confusion to the public and that purchasers would be buying Indiana's products thinking they were those of Jersey.
 
 
 52
 We turn to the specific evidence in order to determine the sufficiency of the present record to support these findings. The plaintiffs base their factual case on a number of items:
 
 
 53
 1. Reputation as one company or several. The plaintiffs introduced evidence that a major sector of the general public, both in the East and in the Midwest, does not regard the respective Standard Oil companies as separate and distinct entities but considers them to be either a single company or separate parts of one company. Various studies over the years 1942-61 tend to bear this out. The plaintiffs also introduced evidence that even executives and directors of Indiana recognized this but felt that it accrued to Indiana's benefit and thus were not particularly concerned. The supplemental fact, of course, is that the same studies disclose that from 16% To 27% Of the population do regard the Standard Oil companies as separate entities. And there are from 11% To 13% In the 'don't know' category.
 
 
 54
 2. Changing motoring habits. The plaintiffs introduced statistical data showing a large increase since 1937, well beyond projected forecasts, in per capita vehicle registration and in travel from one Standard territory to another, not only over long distances but also in short commuter traffic.
 
 
 55
 3. Population origin. The plaintiffs also produced United States Census Bureau reports which suggest that approximately one-sixth of the midwest population consists of persons born outside the 15-state area who presumably brought with them, when they came to the Midwest, an exposure to marks used by other Standard Oil companies.
 
 
 56
 4. Advertising methods. The plaintiffs urge, as a factor unforeseeable in 1937, the great advances in radio and television. This was mentioned by Judge Meredith. 259 F.Supp. at 563. It was a factor, the plaintiffs suggest, in the 1955 agreement, mentioned above, between Indiana and California, concerning advertising spillover at their common boundary.
 
 
 57
 5. Credit cards. The plaintiffs introduced evidence showing great increase since 1937 in the use of gasoline credit cards under exchange agreements among the various Standard Oil companies. These cards distinguish between affiliated and nonaffiliated companies but allow a customer to use the card at the station of any Standard company. The plaintiffs say, 'It clearly appears from these cards, therefore, that American is satisfied that Humble's ESSO mark can be disclosed, indeed advertised, by it to its customers in the 15-state area as the mark of a 'non-affiliated' company. * * *'
 
 
 58
 6. Surveys. A number of surveys entered the record. Judge Meredith referred briefly to some of this evidence. 259 F.Supp. at 564. We could devote many pages outlining the methods and details of these studies but we endeavor to summarize them with the hope that we do so fairly:
 
 
 59
 a. Three surveys by Louis Harris & Associates, Inc., in the fall of 1965. These are heavily relied upon by the plaintiffs. Mr. Harris himself testified. The first related to the 15-state midwest area, the second was nationwide, and the third covered four states (Arkansas, Kentucky, Ohio, and Utah) bordering the 15-state area. The latter two surveys were designed to provide a check against the first. In the midwest study, 80% Recognized the ESSO mark, on a recognition test, as being real, 63% Had seen it, 58% Associated it with gasoline, and only 5% Associated it with Standard Oil. Thus, it is said, ESSO stands independently as a gasoline trademark. 'Esso Extra' as a brand of gasoline was associated with Standard Oil stations by 14.4%. Finally, 7% Of those familiar with stations selling Standard Oil gasoline in their states would go to an ESSO station to purchase the same products. Mr. Harris testified that these percentages could not be totalled because of overlap but that they established a range of association. Allowing for a 3% Margin of error, the study disclosed a maximum association of ESSO with Standard Oil in the Midwest of 18%. In the separate national survey the figures checked closely with those obtained for the midwest area.
 
 
 60
 b. A survey conducted for Indiana during the summer of 1965 by S. H. Britt, professor of marketing at Northwestern University. The result here was that 29% In the Midwest associated ESSO with Standard Oil. This was strenuously attacked on cross examination because of possible bias occasioned by a preliminary question.[10]
 
 
 61
 c. The Popkin survey. This consisted of interviews by counsel for the defendants with 109 persons who had been interviewed in the first Harris survey. It indicated that 49% Gave Standard Oil answers to the ESSO mark. This result would tend to controvert the Harris surveys. Mr. Harris, however, questioned its validity because the persons seen had already been exposed to questioning along the same line. Mr. Popkin conducted a second investigation with a team of lawyers for the purpose of obtaining witnesses for the trial. Persons were interviewed on the street in 13 midwestern cities. Thirty-eight per cent said the word ESSO meant Standard Oil.
 
 
 62
 d. The McCann-Erickson study. This was a small pilot survey conducted for Jersey by an advertising agency in 1957. It concluded that there was greater potential for Esso in Indiana territory than for Indiana in Esso territory, mainly because more midwesterners had seen or used an Esso station than easterners had seen or used an Indiana station. The study also disclosed that, although a large majority of motorists stay with a single brand, the primary reason for their doing so is that they trade at a convenient neighorhood station where they have come to know and like the personnel.
 
 
 63
 7. The change in Indiana's use of S O and SOCO. In 1937 Judge Moore found that Indiana's products had long been known by the symbols S O and SOCO and that these were abbreviations and equivalents of Standard Oil and recognized as such by the public. On appeal this court noted 'their long use' in connection with Indiana's business and that they had come to be understood by the midwestern public as designating Indiana's products. 98 F.2d at 7. The present record discloses that the use of S O and SOCO by the defendants in the interim had diminished to such a point that defendants' trademark counsel became concerned and recommended increased use of the symobols. The letters S O do appear on Indiana's road maps, on gasoline pumps in small letters, on certain industrial and household products, and in some newspaper and television advertising. The use of SOCO has been greatly curtailed. Brand names such as Solite and Stanolind have been progressively phased out. There is evidence that attempts were made by Indiana to slow the disuse of these names and marks.
 
 
 64
 8. The importance of nationwide marks and names. These, of course, can be advertised easily on a national basis. It simplifies labeling and product distribution. It enables a company to compete more effectively. Thus in 1964 Standard of Ohio made 31% Of the retail gasoline sales under the SOHIO label in Ohio but less than .2% Of the sales in the adjacent three states where it uses the name BORON. In the 15-state area Indiana has 18% Of the gasoline market. Humble has less than 1.7% And neither California (including Kentucky) nor Ohio has as much as .5%. In contrast, in the former Socony area comprising the New England states and New York, Mobil continues to lead the market with approximately 16% But Humble, using ESSO in this territory, is a close competitor with about 12% Of the market.
 
 
 65
 Our reactions to this factual material are about as follows:
 
 
 66
 1. The evidence as to the single or multiple company character of Standard Oil goodwill cuts, of course, both ways. On the one hand the evidence has a tendency to establish, as the plaintiffs urge, that the Standard Oil image is a general one to most of the purchasing public. But on the other hand it also reflects public confusion to a substantial degree. We thus find the evidence persuasive neither way.
 
 
 67
 In any event it is instructive to note that in this respect the present record is scarcely to be distinguished from the record of the 1937 case. The earlier record contains the testimony of public witnesses identifying the several Standard Oil companies as one and the same. And a public opinion survey of 1938 of Iowa and Wisconsin males shows 67.2% As feeling Standard Oil was all one company or parts of a larger company and even 12.1% Who 'don't know.' Judge Meredith observed that many persons are unaware that the companies are, in fact, separate and distinct. He found, 'This situation existed in 1937 and it exists today' and 'the conditions which exist today are merely an extension of conditions that led up to the 1937 decree.' 259 F.Supp. at 563, 564.
 
 
 68
 This feature of the evidence afforded Esso, Incorporated, no relief in 1937-38. We could not hold, contrastingly, that it now serves as support for affording the plaintiffs relief. In passing, we note that the same public reaction factor was observed in the Kentucky and Wyoming litigation, mentioned above, 363 F.2d at 951; 141 F.Supp. at 881, and did not prevent the granting of injunctive relief.
 
 
 69
 2. No one familiar with American life could dispute the fact that there have been changes since 1937. Motoring has become more widespread and more complex. This is indeed a generation on wheels. The nation is probably more geographically oriented and more nationally conscious than ever before. Avenues of communication have grown remarkably in use and sophistication and show little heed, even if once they did, to geographical boundaries. Gasoline credit cards tend to blur the distinctions between marketing companies. All this must be accepted as established and as characteristic of modern living.
 
 
 70
 3. Despite all this, the surveys, singly and as a group, do not dispel the existence of a percentage of confusion which we may not dismiss as de minimis. The percentage figure varies from 11% To as high as 49%. The lower figure itself is not an insignificant percentage. The record discloses that the number of motorists in the Midwest is in the millions. Eleven per cent of a figure in the millions is a large number. In the Kentucky case the Fifth Circuit described the confusion disclosed in the record before it as 'profound.' 363 F.2d at 952.
 
 
 71
 4. One reason, of course, for the lesser use by Indiana of the S O and SOCO marks was the assumed inability to use them outside the 15-state area. Another reason was the convenience and desirability of national advertising rather than area-segregated advertising. Although the evidence demonstrates that Indiana's use of S O and SOCO has diminished markedly since 1937, it also shows that, albeit by recommendation from executive headquarters and legal advisors, some use of those symobols still remains. Whatever may be the lessening use by Indiana of S O and SOCO, the record clearly demonstrates that it has never abandoned the use of the Standard name in the 15-state area. Indeed the emphasis there of late has been on 'Standard Oil Division' of American Oil Company.
 
 
 72
 5. Jersey's figures as to comparative shares of the gasoline market are to be tempered somewhat by the fact that Jersey's entrance into the Midwest has been comparatively recent except for the Rocky Mountain region where it has marketed under the Carter name since 1943. Jersey, now using ENCO, has 13% Of the Montana market and more than 5% In Colorado and Wyoming. This appears to be consistent with the conclusion of the McCann-Erickson pilot survey that people tend to trade at local stations because they like the personnel, service, and convenience. Thus a market share may be said to be more appropriately linked to the number of stations and the length of time a company has been marketing in the area rather than to brand name or identification sign. The sign does play a more important part when people are away from home.
 
 
 73
 In our view the case presents the situation where Jersey, having developed ESSO, as it says, into 'one of the bestknown trademarks in the world,' has arrived at the point where it is confident enough in its strength that it proposes not to challenge the use by others of the Standard name in its traditional area and, in return, feels entitled to the use of ESSO elsewhere. But it is prevented from this by the 1937 decree and, in certain states, by the Fifth Circuit's decision and, in still others, by the settlement stipulation made with Standard of California and Standard of Texas. By the present action it seeks to break the hold and impeding effect of the 1937 decree. We are not advised as to how Jersey expects to avoid the effects of the Fifth Circuit decision and of the settlement agreement with California and Texas.
 
 
 74
 We return to the precepts of Swift and of our own Bowdil case, supra, 216 F.2d at 160. We have listed these in detail above and have summarized them as 'caution, substantial change, unforeseeness, oppressive hardship, and a clear showing.' Does the present record then provide a case for relief?
 
 
 75
 We have noted that change has come about since 1937. Motoring habits are different. Distances are less significant, are easily surmounted and are no longer much of a deterrent. The motoring public thinks nationally and is mobile. Advertisements are not to be limited by geographical configurations. The credit economy is a leveling and unifying influence. But we are not persuaded that these changes have been unforeseen and 'so important that dangers, once substantial, have become attenuated to a shadow.' This record reveals that more than a mere shadow of the midwest public still regards the Standard name and its abbreviations and derivatives as the badge of the products of Indiana. In this respect the public identity of Standard Oil companies has been shown to be little different in 1966 than it was in 1937. The change that has taken place is not of that degree of substantialness and the dangers against which the 1937 decree guarded are not so attenuated as to satisfy the precepts of Swift.
 
 
 76
 Neither has the requirement of 'extreme and unexpected' and oppressive hardship been demonstrated. The record shows that the plaintiffs have been able successfully to establish outlets under the ENCO name and sign in the 15-state area (except Missouri) and elsewhere. Between 1959 and 1964, Jersey's share of the market in the area where ENCO was used increased in every state except two (Illinois and Indiana). For the same period, in the territory originally allocated to Jersey and its predecessors and where it marketed under the name ESSO, its share of the market decreased in 15 states and increased in only three and in the District of Columbia. About 20% Of Humble's total motor fuel business is done under the name ENCO. At the time of the 1937 decree Jersey had service stations in 18 states and the District of Columbia; at the time of the 1966 trial, Humble had stations in 47 states. Between 1937 and 1964, Jersey's total assets increased from over two billion dollars to almost 12 1/2 billion and net profits from about 148 million to over a billion. The plaintiffs are the largest petroleum marketers in the world. They account for one-sixth of the sales of petroleum products in the free world.[11]
 
 
 77
 We realize that it is not always safe to utilize growth figures in this way. Nevertheless, although it would be easier, more beneficial, and far more convenient for Jersey to use ESSO in the Midwest, it is not easy for us to extract oppressive hardship from all these facts. Jersey is free to compete and does compete. As Judge Meredith said, 259 F.Supp. at 566,
 
 
 78
 The injunction of 1937 does not prohibit the plaintiffs here from competing with the defendants in the midwest. They are at liberty to build all the filling stations, sell all the gasoline and do anything else they want to do, under the name 'Enco' or any other name they choose to adopt other than 'Esso' or some derivative of the name 'Standard Oil'. This, they are and have been doing.
 
 
 79
 It is perhaps not amiss to point out, repetitively, that the handicap, if it be a handicap, under which the plaintiffs operate in the 15-state area finds its counterpart in the Fifth Circuit's decision in 1966, rendered well after the beginning of the trial of the present case, relating to five states where the plaintiffs had 776 ESSO stations. 363 F.2d at 948. It also has its counterpart, for other states, in the agreement with Standard of California and Standard of Texas.
 
 
 80
 We are fully aware of Jersey's argument that the real reason for the 1937 injunction was the limited experience of the midwestern public at that time with any Standard Oil company other than Indiana and that thus the name actually did identify Indiana as the source of its products whereas today the name no longer so identifies Indiana. We feel that Jersey's argument misconstrues the function of trademarks and trade names as source indicators. The Second Circuit has appropriately observed,
 
 
 81
 Although a valid trademark must serve as an indication of origin, we are not to be construed as saying that it is necessary that purchasers actually know the name of the manufacturer of the goods they purchase. 'It suffices that the public normally assumes that articles bearing the same mark are from the same source.' 3 Callmann, Unfair Competition and Trade-Marks, 84.1, at 1628 (2 ed. 1950). Feathercombs, Inc. v. Solo Prods. Corp., 306 F.2d 251, 255 (2 Cir. 1962), cert. denied 371 U.S. 910 83 S.Ct. 253, 9 L.Ed.2d 170.
 
 
 82
 Thus Indiana's use of the name in the 15-state area identifies a certain chain of stations and certain products as coming from a particular source. The fact that it does not precisely identify Indiana as that source may well be unimportant since Indiana is the only company which properly has used the name in the Midwest. The Standard name possesses a distinctiveness as a source indicator in the area even though it does not make Indiana's customers aware of Indiana's precise relationship to the other Standard Oil companies.[12]
 
 
 83
 Jersey would draw an analogy from the generic name decisions, contending that these hold that loss of distinctiveness in a name follows as a matter of law. from loss of exclusiveness of reputation and goodwill in that name. Among the citations are: Bayer Co. v. United Drug Co., 272 F. 505 (S.D.N.Y.1921); DuPont Cellophane Co. v. Waxed Products Co., 85 F.2d 75 (2 Cir. 1936), cert. denied, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443, and 304 U.S. 575; KingSeeley Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577 (2 Cir. 1963); Dixi-Cola Laboratories, inc. v. Coco-Cola Co., 117 F.2d 352 (4 Cir. 1941), cert. denied, 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938).
 
 
 84
 In these cases the name contested had become the generic or popular term for the article in question. This was so even though there was a small minority who still regarded the word as indicative of source. In the present case, however, even though many people are aware of the various Standard Oil companies and have been exposed to them, it is not true that Indiana's Standard name had lost all significance as a source indicator. The generic name cases hold that, if a name no longer serves in any way as a source indicator, it loses its protection. The loyalty of Indiana's midwest customers arises from the fact that they like its products. Those products for many years have been sold exclusively under the Standard name in the Midwest. The fact that people are aware of other Standard Oil companies does not mean that the Standard name in the Midwest is not indicative of the source of the products sold under that name. On the contrary, it is indicative of the company which operates the Standard stations. As such, it is still entitled to protection.
 
 
 85
 The impact of the antitrust laws. The plaintiffs suggest that, with the continuance of the 1937 decree and territorialization, the public is wronged by being denied the opportunity of effective competition among all Standard Oil companies. It is said that if the territorial allocation were the product of agreement rather than the result of court decree, there would be little doubt that it would violate the antitrust laws. White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), and other cases are cited.
 
 
 86
 This is not a new argument. We encountered an aspect of it in the appeal from the 1937 decree. 98 F.2d at 8. It was answered effectively in Standard Oil Co. (Kentucky) v. Humble Oil and Refining Co., supra, 363 F.2d 945, 953-954, where the Fifth Circuit said:
 
 
 87
 On oral argument, humble also contended that this Court would be violating the intent of the 1961 antitrust consent decree if we prevented its competing with Kentucky under the Esso name. This is precisely the same argument that has been made and rejected numerous times as to the intent of the 1911 dissolution decree. Esso, Inc. v. Standard Oil Co. (of Indiana), 98 F.2d 1, at 8 (8 Cir. 1938); Standard Oil Company (Sohio) v. Standard Oil Company (of Indiana), 252 F.2d 65, at 76, (76 A.L.R.2d 600) (10 Cir. 1958); Standard Oil Co. of Maine v. Standard Oil Co. of New York, 45 F.2d 309, at 313 (1 Cir. 1930). The antitrust laws require competition, not piracy. The essence of competition is the ability of competing products to obtain public recognition based on their own individual merit. A Product has not won on its own merit if the real reason the public purchases it is that the public believes it is obtaining the product of another company. There is not now, nor has there ever been, a conflict between the antitrust laws and trademark laws or the law of unfair competition. The antitrust laws could go further than to envision Humble's entering the market and competing under one of its non-Standard
 
 
 88
 Further, as has been pointed out, there this way Humble could obtain customers based on its own merits. * * *
 
 
 89
 Futher, as has been pointed out, there is no absence of effective competition among the various Standard Oil companies and there is no price-fixing tie-in with trademark use. The competition may not be so great or so effective or so convenient as perhaps would be the case were the name ESSO universally usable. But that fact, upon the circumstances here, is not an antitrust violation.
 
 
 90
 We therefore conclude and, except for the voluminousness of the record, do so without too much difficulty, that Judge Meredith's findings on the merits find adequate support in the record. The standards pronounced by the gentle Cardozo in Swift over 35 years ago are still the law applicable here and, in our view, the plaintiffs have not demonstrated the substantial change, the unforeseenness, and the oppressive hardship which those standards require. Having in mind, too, that by Swift our inquiry has limitations and that there must be a clear showing of nothing less than 'grievous wrong,' the 1937 decree, on this record, must continue in effect.
 
 
 91
 Were the slate clean, one might argue with some force that full and unlimited competition among all the Standards-- one on each corner of the intersection, so to speak-- would be good for the public and would be in the national tradition. Perhaps. But the Standard slate is not clean and unencumbered. It is colored and indeed composed of the 1911 decision; of the dissolution of the old Trust; of the territorial allotment flowing from that dissolution; of the 1937-Eighth Circuit decree; of the Wyoming-Tenth Circuit decree; and of the Kentucky-Fifth Circuit result. This is the full slate which confronts us, and the plaintiffs as well, and with which we all must work. As Mr. Justice Cardozo observed-- and, in so saying, he touched the nerve-- we are not framing a decree. Instead the district court and we are asked to modify or amend an existing one. There is a world of difference between the two situations.
 
 
 92
 Unclean hands. This was an alternate ground for the district court's decision. In view of our holding on the merits, there is no need for us to explore and rule upon this aspect of the case. We say only that we find ourselves somewhat less certain of agreement with the district court's ruling on the application of the doctrine of unclean hands than we are with its ruling on the merits. Conversely, however, we are entirely satisfied that the court's ruling on the merits was not tainted by its conclusion as to unclean hands. We therefore affirm but, in so doing, we expressly refrain from approving or disapproving the district court's ruling on the unclean hands issue.
 
 
 93
 Affirmed.
 
 
 
 [1]
 For a preliminary phase of the present litigation see Humble Oil & Refining Co. v. American Oil Co., 224 F.Supp. 909 (E.D.Mo.1963)
 
 
 [2]
 There are also certain unreported decisions consistent with the cited cases. Among these are Esso Standard Oil Co. v. Standard Oil Co. of Virginia, (decree entered November 29, 1955, by the United States District Court for the Western District of Virginia); Esso Standard Oil Co. v. Stone Oil Co. (decree entered October 2, 1959, by the United States District Court for the Western District of Pennsylvania); Standard Oil Co. (Indiana) v. Standard Oil Co. of Venezuela (decree entered April 5, 1951, by the United States District Court for the District of Nebraska); Standard Oil Co. (Indiana) v. Green (decree entered June 6, 1957, by the United States District Court for the Northern District of Illinois); and Standard Oil Co. (Indiana) v. Mercer (decree entered July 6, 1942, by the United States District Court for the District of Montana)
 
 
 [3]
 Defendant, Esso, Incorporated, its agents, servants, representatives, employees, attorneys, confederates, and all others acting for, with, through or under it and each of them, be and hereby are perpetually enjoined and restrained:
 (a) From using in the states of Missouri, Colorado, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Montana, North Dakota, Oklahoma, South Dakota, Wisconsin or Wyoming in connection with petroleum and its products or in the petroleum industry or in connection with the sale of any articles similar to those heretofore marketed by plaintiff, in any name, corporate or otherwise, or as a brand for merchandise, or in any manner:
 
 
 [1]
 The term 'Esso', either alone or in combination with other names, terms, letters, marks, symbols or syllables
 
 
 [2]
 Any of plaintiff's trademarks or trade names, i.e., 'Standard Oil Company', 'Standard Oil', 'Standard', 'SOCO', or 'SO' or any names, terms, marks or symbols colorably similar thereto in sound, appearance, significance or meaning, or any combination thereof with other names, terms, letters, marks, symbols or syllables
 (b) From selling, offering or advertising for sale any product not plaintiff's product of a similar nature to the products heretofore marketed by the plaintiff in the above named states under any name or mark or by any method indicating that such product is the product of Standard Oil Company;
 (c) From committing any other act or acts calculated to cause confusion or to infringe, injure or damage the rights of the plaintiff in and to its trademarks, name and good will, and from otherwise competing unfairly with the plaintiff by any means or in any manner.
 
 
 [4]
 Among the 1937 findings of fact are:
 
 
 [7]
 Plaintiff and its products have long been known in the localities where it operates by the nicknames 'S O C O', 'S O', 'S O Company', 'Standard', and 'Standard Oil.'
 
 
 [8]
 In the states in which plaintiff operates there are various persons who are aware of the fact that there are several concerns in the petroleum industry known by names which include the words Standard Oil, but in these states the terms 'Standard', 'Standard Oil', 'S O' and 'S O C O' and variants thereof are used by the public to identify the plaintiff and the plaintiff's products
 
 
 [9]
 Defendant's parent company, Standard Oil Company (New Jersey), at various times has asserted and admitted that 'Standard' and 'Standard Oil' as used by each of the Standard Oil Companies in the respective localities where each operates (including the plaintiff here) indicate in each such locality the company operating in that locality and none of the others
 
 
 [11]
 'S O' and 'S O C O' are abbreviations of and equivalents of 'Standard Oil', and are recognized as such by the public
 
 
 [12]
 Standard Oil Company of New Jersey and Standard Oil Company (New Jersey), which defendant in its brief refers to as its associates, have recognized and acknowledged plaintiff's exclusive rights in 'Standard Oil Company', 'Standard', and 'Standard Oil' in said states
 
 
 [14]
 Continuously, since the dissolution decree in 1911, the various Standard Oil companies, including plaintiff, have used one or more of the trademarks 'Standard', 'Standard Oil', 'Standard Oil Company', 'S O C O', 'S O', or abbreviations of such marks or variations of them, exclusively in the territory where each has operated under the name Standard Oil Company and each of said companies has acquired common law rights in marks used by it in the states in which it has used its said trademarks which rights are exclusive of the other companies and each has recognized the rights of each of the others to use said marks exclusively in its own locality. Each company has competed with the others without limitation of locality under many different names and trademarks, which do not include 'Standard' or similar words. * * *
 
 
 [15]
 The Standard Oil Company of New Jersey. or the Standard Oil Company (New Jersey), or both, in the past in applying to various courts for protection for their trademark rights in the words 'Standard' or analogous marks have repeatedly represented to said courts as a basis for desired relief that the rights of each of the Standard Oil Companies in the states in which it conducts its business are exclusive of each of the other Standard Oil Companies and that such rights in each company are based on exclusive use of such trademarks in the territory in which it has conducted its business under such trademarks
 
 
 [26]
 Plaintiff's use of 'Standard', 'Standard Oil', 'S O' and 'S O C O', both prior to and after defendant's use of 'Esso' has been a continuance of its long use of those marks and was in exercise of its then existing rights
 
 
 [27]
 The public regard the letters 'S O' when used in connection with petroleum products sold by plaintiff as being the initials of 'Standard Oil Company' and 'Standard Oil' and understand them to mean that such products are made by or sold by plaintiff or by a subsidiary of plaintiff or by a concern connected with plaintiff, or by a concern selling plaintiff's goods
 
 
 [28]
 'Esso' is the spelled out form of 'S O'
 
 
 [29]
 'Esso' is identical in sound and significance to 'S O'
 
 
 [30]
 'Esso' is the equivalent of 'S O'
 
 
 [31]
 'Esso' is confusingly similar to 'S O' and 'S O C O.'
 
 
 [32]
 'Esso' is the equivalent of 'Standard Oil' to many consumers of petroleum products
 
 
 [33]
 Defendant's parent company, Standard Oil Company of New Jersey, in seeking relief and protection from courts of equity has asserted and represented to such courts that 'Esso' is identically the same as the letters 'S O' and also that 'S O' is the same as 'S O C O'
 
 
 [34]
 The intent of the Standard Oil Company of New Jersey in its use of Esso as a brand and as part of the corporate name of defendant 'Esso, Incorporated', is to sell its goods as 'Standard Oil' and 'S O' goods in states in which these brands are not its trademarks and trade names, but are the trademarks and trade names of its competitors; and by so doing to enable it to deceive the public to its advantage and profit * * *
 
 
 [35]
 Members of the public seeing the word 'Esso' displayed at defendant's stations believe that the products sold there are the products of the plaintiff or of a subsidiary of plaintiff, or of a company connected with plaintiff or selling plaintiff's products * * *
 
 
 [40]
 The term 'Esso' does not describe and is not understood as meaning any particular grade or quality of product. It has no meaning except as the equivalent of the letters 'S O'
 
 
 [42]
 Defendant's use of the colors red, white and blue in the combination in which it uses them on its stations and on its cans in which it sells its products is sufficiently different from plaintiff's combination and arrangement of such colors, that if used without the word 'Esso', or any word of which 'Esso' is a part, or any other word or symbol similar to or suggesting the marks or names 'S O', 'S O C O', 'Standard', 'Standard Oil', 'Standard Oil Company', or any one or more of them, the public is not likely to be deceived into believing that the products sold at the stations and in cans bearing defendant's combination of such colors, are plaintiff's products
 Among the 1937 Conclusions of Law are:
 
 
 [1]
 The terms 'Standard', 'Standard Oil', 'Standard Oil Company', 'S O', and 'S O C O', are plaintiff's (Indiana's) trademarks and trade names. Plaintiff is entitled to their exclusive use in the states in which it conducts its business
 
 
 [3]
 Defendant's use of 'Esso' infringes plaintiff's rights and constitutes unfair competition
 
 
 [4]
 The registration of 'Esso' in the United States Patent Office, whether by the defendant, Esso, Incorporated, or by Standard Oil Company of New Jersey or Standard Oil Company (New Jersey), has not created any trademark rights therein effective in any of the states in which plaintiff operates
 
 
 [8]
 Defendant, Esso, Incorporated, is estopped to deny plaintiff's exclusive trademark rights in 'S O', 'S O C O', 'Standard', 'Standard Oil' and 'Standard Oil Company' in the states in which it does business and is further estopped to deny that 'Esso' is the equivalent of 'S O' and that said defendant's use of 'Esso' in such states is an infringement of plaintiff's rights in 'S O', 'S O C O', 'Standard', 'Standard Oil' and 'Standard Oil Company'
 
 
 [5]
 It is urged that the word 'Esso' is not so similar to the trademarks 'Standard Oil,' 'S O,' and 'S O C O' as to be confusing. It is the accepted rule that similarity of sound, as well as appearance, of the words or letters may constitute infringement * * * 'Esso,' when pronounced, is indistinguishable from 'S O.' The initials of the Standard Oil Company are the source from which these marks and brands were derived, and we surmise the value of the brand 'Esso' lies in the fact that it suggests 'Standard Oil' * * *
 * * * It is the purpose of the law to protect not only the owner in his property, but to protect the public from being deceived by reason of a misleading claim that the article bearing the trade-mark is the article produced or manufactured by the owner of the trade-mark when in fact it is not. * * *
 It was not necessary to show that any person had been actually deceived by the defendant's use of the trade-names or trade-marks in question and led to purchase its goods on the belief that they were the goods of plaintiff. * * * The court, however, found this to be the fact, and this finding is sustained by the evidence. * * *
 The circumstance which distinguishes this case from many others is the fact that defendant's parent company bears the same name substantially as the plaintiff, and, confessedly, in its own trade territory it would have the right to use any of the words or names it is now using. The question is, therefore, can it use these names, letters and marks in plaintiff's trade territory. * * *
 The owner's right to have his trademark protected is coextensive only with the territory throughout which it is known and from which it has drawn its trade. * * *
 In the instant case, the court found that the letters, words and names in controversy have, by reason of their long use in connection with the business and trade of plaintiff, come to be understood by the public in the states named, as designating the goods and products of plaintiff. In these circumstances, defendant, being subsequent in time in the territory mentioned, is not entitled to use these terms or names, even though they may be abbreviations of its own name, because to do so would cause its goods and products to be known in the market of those states as those of plaintiff.
 It is argued that the defendant is endowed by inheritance or otherwise, with the name 'Standard Oil Company,' and that plaintiff is not entitled to a monopoly of the Standard Oil reputation. The only Standard Oil reputation known to the public in the states mentioned is the reputation of the plaintiff in this suit. * * * There was no right of good will established in this territory by the New Jersey Company. There was no good will owned in common, but a separate good will appertaining to the separate business as carried on by the varions companies in their allotted territory. Not only has the New Jersey Company never had any actual business in these states, but that company has for many years acquiesced in the asserted claim of the various companies formerly in combination to the right of good will in their separate territories, and has itself claimed such rights in the territory occupied by it.
 
 
 [6]
 For a current chapter in that 3-decadesold litigation, see Standard Oil Co. (Indiana) v. Standard Oil Co. (New Jersey), 239 F.Supp. 97 (E.D.Mo.1965)
 
 
 [7]
 The ESSO trademark was also used by Humble in Alabama, Florida, Georgia, Kentucky, and Mississippi from 1961 until 1967 when its use in those states ceased as a result of the decision in Standard Oil Co. (Kentucky) v. Humble Oil & Refining Co., supra, 363 F.2d 945
 
 
 [8]
 In its brief, the plaintiffs state, 'we recognize that the contentions herein made, if upheld, would also affect the validity of that stipulation.'
 
 
 [9]
 'The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making.' United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932)
 
 
 [10]
 In the Humble-Kentucky litigation criticism of survey method was noted. 363 F.2d at 949
 
 
 [11]
 Similarly, Indiana, Standard of California, and Standard of Ohio have been able to capture noticeable shares of the market outside their respective traditional areas under names other than Standard or its abbreviations and derivatives
 
 
 [12]
 In Walter Baker & Co. v. Slack, 130 F. 514, 518 (7 Cir. 1904), the court observed, in granting relief, 'We may safely take it for granted that not one in a thousand knowing of or desiring to purchase 'Baker's Cocoa' or 'Baker's Chocolate' know of Walter Baker & Co., Limited'